## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-02523-SBP

MATTHEW SPRAGUE and
AMANDA SPRAGUE,

      Plaintiffs,

v.

STATE FARM FIRE AND CASUALTY COMPANY,

      Defendant.

---

### MEMORANDUM OPINION AND ORDER ON PENDING MOTIONS

**Susan Prose, United States Magistrate Judge**

      This civil action is before the court on several pending motions. The undersigned Magistrate Judge fully presides over this case pursuant to 28 U.S.C. § 636(c), the parties' consent (ECF No. 12), and the Order of Reference dated November 17, 2023 (ECF No. 13). Defendant State Farm Fire and Casualty Company ("Defendant" or "State Farm") has filed a Motion for Summary Judgment (ECF No. 34) and two motions to exclude opinion testimony: a Motion to Exclude Cost Estimation Opinions Pursuant to F.R.E. 702 and F.R.C.P. 37 (ECF No. 33) and a Motion to Exclude Opinions of Stephen Collins Pursuant to F.R.E. 702 (ECF No. 35). The court has considered the motions and associated briefing, the applicable case law, and the parties' respective presentations at an oral argument conducted on January 14, 2025. ECF No. 51.

      At a status conference on June 10, 2025 (ECF No. 68), the court stated that the parties should anticipate that the Motion for Summary Judgment would be denied. Upon further

consideration, the court has determined that summary judgment will be denied on all claims, with the exception of one aspect of one claim arising under one of three components of the insurance coverage at issue is this litigation. Therefore, for the reasons detailed below, summary judgment is **GRANTED in part** and **DENIED in part**. Both motions to exclude opinion testimony are respectfully **DENIED**.

## MOTION FOR SUMMARY JUDGMENT

### I.    Background

This case arises out of a homeowners insurance policy issued by State Farm to Plaintiffs Matthew and Amanda Sprague ("Plaintiffs" or "the Spragues"). Complaint, ECF No. 4 ¶ 7. On February 4, 2022, a water pipe burst in the Spragues' home, causing extensive damage. *Id.* ¶ 6. On August 25, 2023, the Spragues initiated this civil action in the District Court for Larimer County, Colorado, which State Farm removed to this court on September 27, 2023. ECF No. 1. The Complaint raises three iterations of a breach of contract claim: (1) bad faith breach of insurance contract stemming from the unreasonable delay or denial of insurance benefits under Colorado Revised Statute §§ 10-3-1115 and 10-3-1116 (Claim One); (2) common law bad faith breach of insurance contract (Claim Two); and (3) breach of contract (Claim Three). *See generally id.* State Farm answered the Complaint on October 18, 2023. ECF No. 10.

On October 22, 2024, State Farm filed the instant Motion for Summary Judgment, seeking judgment in its favor on each of Plaintiffs' three claims. ECF No. 34. Plaintiffs responded in opposition on November 19, 2024, ECF No. 38, and State Farm replied on December 3, 2024. ECF No. 45.

## II.    Undisputed Facts

The court finds that the following facts, drawn from the parties' briefing, are undisputed unless otherwise noted:

1.    State Farm issued a homeowners insurance policy (the "Policy") to the Spragues. ECF No. 34 ¶ 2; ECF No. 34-1 ¶ 3.

2.    The claim under the Policy at issue here concerns damage to Plaintiffs' residence in Johnstown, Colorado, which occurred after a pipe in a fire suppression system burst on February 4, 2022. Declaration of Michael Newth,[1] ECF No. 34 ¶ 1.

3.    The Policy provides coverage for the restoration of the Spragues' dwelling ("Coverage A"), personal property ("Coverage B"), and alternate living expenses ("Coverage C"). ECF No. 34 ¶ 2.

4.    The "Loss Settlement" provision of the Policy addresses the Replacement Cost Benefit, sometimes called "RCV," available to the policyholder:

> **COVERAGE A – DWELLING**
> **1. A1 – Replacement Cost Loss Settlement – Similar Construction.**
> a. *We* will pay the cost to repair or replace with similar construction and for the same use on the premises shown in the *Declarations*, the damaged part of the property covered under **SECTION I – PROPERTY COVERAGES, COVERAGE A – DWELLING**, except for wood fences, subject to the following:
> (1) until actual repair or replacement is completed, *we* will pay only the ***actual cash value*** of the damaged part of the property, up to the applicable limit of liability shown in the ***Declarations***, not to exceed the cost to repair or replace the damaged part of the property;
> (2) when the repair or replacement is actually completed, *we* will pay the covered additional amount *you* actually and necessarily spend to repair or replace the damaged part of the property, or an amount up to the applicable limit

---

[1] Mr. Newth was the adjuster who was primarily responsible for handling the Spragues' claim. ECF No. 34-1 ¶ 2.

of liability shown in the ***Declarations***, whichever is less; [and]

(3) to receive any additional payments on a replacement cost basis, ***you*** must complete the actual repair or replacement of the damaged part of the property within two years after the date of loss, and notify us within 30 days after the work has been completed[.]

ECF No. 34 ¶ 3; ECF No. 34-1 ¶ 7; ECF No. 34-1 at 33 (emphasis in original).

5.      As pertinent to the foregoing section of the Policy, "actual cash value"—or "ACV"—"means the value of the damaged part of the property at the time of loss, calculated as the estimated cost to repair or replace such property, less a deduction to account for pre-loss depreciation." ECF No. 34-1 at 15[2]; *see also id.* at 20-22 (discussing scope of property covered under Coverage B); *id.* at 22-23 (discussing scope of coverage for "loss of use," including additional living expenses, or "ALE").

6.      The "Conditions" section of the Policy imposes certain "duties after loss" on the insureds:

2. **Your Duties After Loss.** After a loss to which this insurance may apply, ***you*** must cooperate with us in the investigation of the claim and also see that the following duties are performed:

. . .

c. prepare an inventory of damaged or stolen personal property:

(1) showing in detail the quantity, description, age, replacement cost, and amount of loss; and

(2) attaching all bills, receipts, and related documents that substantiate the figures in the inventory;

. . .

e. submit to us, within 60 days after the loss, ***your*** signed, sworn proof of loss that sets forth, to the best of ***your*** knowledge and belief:

. . .

(5) specifications of any damaged structure and detailed estimates for repair of

---

[2] The court uses the terms "actual cash value" and "ACV" interchangeably throughout this Order.

the damage;

(6) an inventory of damaged or stolen personal property described in 2.c. However, the time period for submitting an inventory may be extended up to 365 days by Colorado law; [and]

(7) receipts for additional living expenses incurred and records supporting the fair rental value loss[.]

*Id.* at 35 (emphasis in original).

7.     The Policy provides, under the heading "Suit Against Us," that "[n]o action will be brought against **us** unless there has been full compliance with the policy provisions." ECF No. 34 ¶ 5 (emphasis in original); ECF No. 34-1 at 37.

8.     State Farm asserts it understood that Mr. Sprague, who operates a company called Sprague Structural Solutions, would serve as the general contractor for the "entire restoration" and would be procuring an estimate, ECF No. 34 ¶¶ 8-10, 25, ECF No. 34-1 ¶ 35, but the Spragues dispute that either they or their company planned to serve as the general contractor for the mitigation or restoration of their residence. ECF No. 38 ¶¶ 8-10.

9.     Notwithstanding any provision in the Policy concerning Plaintiffs' obligation to provide an estimate of damage to the home, State Farm informed Plaintiffs that it was undertaking to obtain an estimate. *Id.* ¶ 10; ECF No. 38-3 at 46 (February 13, 2022 letter from State Farm to Mr. Sprague stating that "[w]e are preparing an estimate for the repairs to your home").

10.     One channel that State Farm utilized to attempt to obtain an estimate was through its "estimate only program," pursuant to which it retained a company call Alacrity General Contracting Services." ECF No. 34 ¶ 28; ECF No. 38-3 at 44 (March 2, 2022 letter from Newth to Mr. Sprague stating that, "[t]o assist in the adjustment of your loss, we agreed to retain

Alacrity General Contracting Services" who "will assign an estimate writer from their network to provide an estimate for structural repairs and replacements").

11.     Mr. Newth averred in his declaration that Alacrity General Contracting ultimately was "unable to complete the estimate under the estimate only program," and stated that "[t]here were no other contractors available to work under the estimate only program." ECF No. 34 ¶ 27; ECF No. 34-1 ¶ 33.

12.     On May 11, 2022, Mr. Newth retained Chad Whisenhunt of Hall Ryan Construction to prepare an estimate. ECF No. 34 ¶ 30; ECF No. 34-1 ¶ 34.

13.     In connection with his preparation of the estimate, Mr. Whisenhunt went to the Spragues' residence in late July 2022 to evaluate the damage. ECF No. 34 ¶ 35.

14.     By letter to the Spragues dated August 1, 2022, Mr. Newth stated that Mr. Whisenhunt had visited the Spragues' property on July 26, 2022, and that "State Farm has requested Hall Ryan Construction prepare the remainder of the reconstruction estimate . . ." ECF No. 34 ¶ 36; ECF No. 38-3 at 47.

15.     In an August 8, 2022 letter from Matthew Athey, Plaintiffs' attorney, directed to Mr. Newth, to "State Farm Claims" in Atlanta, Georgia, and to "Corporation Service Company" in Littleton, Colorado, Mr. Athey stated that Plaintiffs had obtained their own estimate, which counsel represented was enclosed with his letter:

> [O]ur law firm has hired Charles Taylor Technical Services to provide an Xactimate.[3] *See* Charles Taylor Report *enclosed herewith*. The Xactimate Net Claim as assessed by Charles Taylor Technical Services is $959,495.74.

---

[3] The court understands "Xactimate" to be a type of restoration-estimating software commonly used in the insurance industry. *See* https://xactimate.com/home/, last visited June 17, 2025.

ECF No. 38-3 at 64 (emphasis in original); *see also id.* (noting that there were "Enclosures" with the letter).

16.    Mr. Newth states that the August 8, 2022 letter from Plaintiffs' counsel "did not attach the estimate" from Charles Taylor, ECF No. 34-1 ¶ 44, as Mr. Athey had indicated.

17.    There is no evidence in the record indicating that Mr. Newth, or anyone else from State Farm, contacted Plaintiffs' counsel to advise him that the estimate was not included, or otherwise attempted to obtain the Charles Taylor estimate referenced in the August 8, 2022 letter.

18.    If Mr. Newth "had known Plaintiffs were going to retain CTETS [Charles Taylor Engineering and Technical Services], [he] would probably have used their estimate for reconciliation and the ACV Payment," but he did not do that because "State Farm did not have the [Charles Taylor] estimate[.]" *Id.* ¶¶ 45-46.

19.    As of October 21, 2022, State Farm had not given the Spragues a copy of the estimate from Hall Ryan, the company that State Farm had retained to prepare an estimate.[4] ECF No. 38 ¶ 55; ECF No. 38-3 at 74 (October 21, 2022 letter from Athey to Newth, State Farm Claims, and Corporation Service Company, stating that Plaintiffs were "awaiting the Hall Ryan Construction estimate, as well as a response regarding our Charles Taylor . . . estimate").

20.    By letter dated October 25, 2022, Mr. Newth informed Plaintiffs and their counsel

---

[4] State Farm has not presented evidence clearly stating when it had the Hall Ryan estimate in hand, although there is a reference in the October 21, 2022 letter from Mr. Athey referencing "correspondence from Mr. Newth on August 27th" stating that the Hall Ryan estimate "had been received" by State Farm and asking Mr. Newth to "provide us a copy of this quote." ECF No. 38-3 at 73. The court cannot locate a date on the Hall Ryan estimate itself, save for what appears to be a print date of April 1, 2024. *See* ECF No. 38-2.

that State Farm had performed a reconciliation based on the Hall Ryan estimate, ECF No. 38-3, and had determined that "[t]he estimate to repair, rebuild, or replace your damaged property is $587,774.57 of which $164,719.32 is being deducted for depreciation. This leaves an actual cash value settlement of $423,055.25." ECF No. 34-1 at 65. State Farm forwarded a payment to the Spragues of $399,150.52, the amount remaining after deducting the ACV that State Farm had already paid. ECF No. 34-1 ¶ 47 & 65.

21.     In a December 16, 2022 letter, Mr. Athey informed Mr. Newth that "the Spragues have chosen Forge & Bow Dwellings as the general contractor to rebuild their home." ECF No. 38-3 at 59. Plaintiffs' estimated budget for the project "comes from the Charles Taylor Engineering and Technical Services estimate and not State Farm's Xactimate because that estimate is not feasible." *Id.* at 59-60 (stating that "we anticipate the actual cost for construction to greatly exceed State Farm's Xactimate and perhaps even the Spragues' estimate from [Charles Taylor]." *Id.* at 60.

22.     On January 30, 2023, Mr. Newth discussed State Farm's estimate with Jordan Obermann of Forge & Bow and "offered to meet him to reconcile" on February 1, 2023. ECF No. 38-3 at 5. Mr. Obermann apparently declined to meet with Mr. Newth at that time. *Id.*

23.     On May 15, 2023, Mr. Athey informed Mr. Newth that "Forge & Bow is currently working on preparing its bid for the reconstruction of the Sprague residence," and that "[o]nce its bid is finalized, Forge & Bow is expected to contact State Farm to reconcile its bid with the estimate provided by State Farm. Forge & Bow estimates that its bid will be completed in approximately 8 weeks." ECF No. 38-3 at 29.

24.     The Forge & Bowe estimate indicates that it was provided to the Spragues on or

about July 14, 2023. ECF No. 38-3 at 65 (reflecting a "proposal date" of "7.14.23").

25.     On July 27, 2023, State Farm received the Forge & Bow estimate, ECF No. 34-1 ¶ 50, which set forth a "Project Construction Budget" to restore the Spragues' residence of $1,234,301.63. *Id.* at 72.

26.     State Farm then asked the Spragues for information it needed to reconcile the Forge & Bow estimate, but State Farm never received that information. ECF No. 38 ¶ 52.

27.     Mr. Sprague states that, during a meeting on July 27, 2023, with Mr. Newth and others, the Spragues were informed by an individual named Kimberly Templeman—who is identified as a "State Farm representative"—that "State Farm would not pay for restoration costs because the work could not be completed within twenty-four (24) months of the loss." ECF No. 38-2 ¶ 50; *see also* ECF No. 34-1 at 33 (per the Policy, "to receive any additional payments on a replacement cost basis, ***you*** must complete the actual repair or replacement of the damaged part of the property within two years after the date of loss, and notify us within 30 days after the work has been completed") (emphasis in original).

28.     State Farm disputes that Ms. Templeman made this statement at the July 27, 2023 meeting. Per Mr. Newth,[5] "my colleague explained to the Spragues' counsel that the replacement cost would be available if the Spragues were under contract with Forge & Bow or anyone for the restoration before the two-year anniversary of the loss." ECF No. 34-1 ¶ 52; *see also id.*

---

[5] There is no affidavit or other sworn testimony from Ms. Templeman in the summary judgment record or in the record appended to the motion in limine State Farm filed on January 13, 2025. *See* ECF No. 49 at 2 (listing exhibits); *id.* at 12 (seeking to exclude evidence regarding the July 27, 2023 conversation at trial). The court will address State Farm's pending motions in limine, ECF Nos. 49, 59, by separate order.

¶ 8 (statement by Newth that, while the "policy puts a two-year limit on [replacement cost] benefits, . . . State Farm sometimes allows policyholders to have the benefit as long as they have the restoration under contract within the two-year period").

29.    There is no evidence in the record indicating that the Spragues have restored their residence.

30.    The Spragues filed the instant lawsuit on August 25, 2023. ECF No. 4.

31.    In November 2023, the Spragues purchased a different home, where they now reside. ECF No. 38 ¶ 54.

### III.    Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (cleaned up).

A movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim, but need only point the court to a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). Once the movant has met this initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation omitted). When considering the evidence in the record, the court is prohibited from weighing the evidence or

determining the credibility of witnesses. *Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). At all times, the court "view[s] the evidence and draw[s] reasonable inferences therefrom in the light most favorable to the nonmoving party." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002) (quotation omitted).

## IV.    Analysis

State Farm argues that it is entitled to summary judgment because Plaintiffs cannot establish a breach of any policy provision or that any benefit was delayed or denied. ECF No. 34 at 14-17. Alternatively, State Farm contends that the common law bad faith breach of contract and statutory bad faith breach of contract claims fail as a matter of law because there is no material dispute that Plaintiffs cannot establish a breach of the standard of care. *Id.* at 17-20.

### A.    Alleged Breach Concerning Coverage A

### 1.    Scope of Plaintiffs' Claims Under Coverage A

The court first takes up a threshold issue concerning State Farm's construction of Plaintiffs' claims. State Farm argues that Plaintiffs are precluded from pursuing any claim for recovery based on alleged deficiencies in the amount of actual cash value payments because Plaintiffs "have never asked for State Farm to reconsider or supplement the total ACV amount." ECF No. 34 ¶ 55; *id.* ¶¶ 58-59; *id.* at 19 ("Plaintiffs do not allege the ACV benefits were insufficient"); *id.* at 23 (Plaintiffs "never claimed the ACV was insufficient").

Plaintiffs vigorously dispute State Farm's assertion, countering that they are indeed "seeking damages for breach of contract and bad faith breach of insurance contract that arise from State Farm's failure to pay covered benefits, including those that were improperly withheld by State Farm when it made the insufficient October 26, 2022 ACV payment." ECF No. 38 ¶ 58

(further stating that "[t]he measure of actual and statutory damages Plaintiffs are entitled to recover following State Farm's breach of contract is a question of law, not an undisputed fact"); *see also* ECF No. 4 ¶ 53 (alleging that "State Farm has breached the insurance contract by denying and/or delaying the payment of benefits due to the Spragues under the Policy for damages resulting from the loss").

The court finds that the Spragues have pointed to evidence in the record showing that they are pursuing a claim based on allegedly insufficient ACV payments. That evidence, construed in the light most favorable to them, demonstrates that they obtained their own estimate from Charles Taylor and sent it to the State Farm Claims department, Corporation Service Company, and Mr. Newth on August 8, 2022. Undisputed Facts ¶¶ 15-16. The Charles Taylor estimate included an estimated ACV of $911,652.02—an amount nearly $500,000 greater than the $423,055.25 estimated ACV in the Hall Ryan estimate on which State Farm ultimately based its ACV calculation. *Id.* ¶¶ 15, 16, 20. Plaintiffs also have shown that they expected Mr. Newth to consider their estimate and to respond, as evidenced in a follow-up letter to him dated October 21, 2022. *Id.* ¶ 19. The evidence in the summary judgment record further shows that Mr. Newth did not respond to the Charles Taylor estimate, even though he avers that, had he "known Plaintiffs were going to retain [Charles Taylor], [he] *would probably have used their estimate for reconciliation and the ACV Payment*." *Id.* ¶ 18 (emphasis added).

Based on this evidence, a reasonable juror could find that Mr. Newth *did* know that Plaintiffs had produced, and requested that Mr. Newth review, an estimate from Charles Taylor, and that the use of that estimate in the reconciliation process would have yielded a substantially

higher ACV payment to Plaintiffs than the one State Farm issued on October 26, 2022.[6] Further, based on this evidence, a reasonable juror could conclude that Mr. Newth understood the Charles Taylor estimate to be of critical importance to State Farm's evaluation, rendering State Farm's decision not to reconcile that estimate unreasonable, if not reckless. To be clear, this court explicitly makes no determination as to whether any State Farm official acted improperly, but only that there is sufficient, competent evidence to present the question to a jury.

In so finding, the court notes that it is not persuaded by State Farm's argument that the August 8, 2022 letter from Mr. Newth to State Farm officials is inadmissible and, therefore, must be disregarded for purposes of the summary judgment analysis. *See* ECF No. 45-1 ¶ 48 (asserting that the letter is "unsworn hearsay" and that "Mr. Athey is not disclosed as a witness"). Plaintiffs, however, are not obliged, at the summary judgment stage, to submit evidence in a form that would be admissible at trial. *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). It is also apparent that Plaintiffs would be able to present the relevant "content or substance" of the letter—including the date on which State Farm received, or at least had knowledge of, the completed Charles Taylor estimate—in a form that would be admissible at trial, by means of their own testimony and perhaps through examination of Mr. Newth or other State Farm officials. *See id.*[7]

---

[6] State Farm attempts to refute this evidence by pointing to references to the October 26, 2022 ACV payment of $399,150.02 in Plaintiffs' pretrial disclosures and in their response to a discovery request. ECF No. 34 ¶¶ 58-59. Considered in the context of the summary judgment record as a whole, these references do not suffice to show the absence of a genuine dispute concerning State Farm's calculation of ACV.

[7] The court finds this situation materially distinguishable from that in *O'Sullivan v. Geico*

In sum, the evidence in the record, construed in the light most favorable to Plaintiffs, manifests a genuine dispute concerning the existence of a request "to reconsider or supplement the total ACV amount," and State Farm's failure to respond to that request. *See* ECF No. 34 ¶ 55. For this court to conclude otherwise would require an overly-narrow construction of the competent record evidence and oblige the court to resolve all reasonable inferences on this point *against* Plaintiffs and in favor of State Farm. This the court cannot do. *Tolan v. Cotton*, 572 U.S. 651 (2014) (courts must "adhere to the axiom that in ruling on a motion for summary judgment, '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor'") (quoting *Anderson*, 477 U.S. at 255).

The court therefore will construe Plaintiffs' claims as encompassing alleged breaches in connection with State Farm's handling of both ACV and replacement cost benefits. The court structures its analysis accordingly.

### 2.    Alleged Breach Concerning Payment of Actual Cash Value

### a.    General Breach of Contract Claim (Claim Three)

Under Colorado law, a breach of contract claim has four elements: (1) the existence of a contract; (2) performance by the plaintiff; (3) failure to perform the contract by the defendant; and (4) damages suffered by the plaintiff as a result of the defendant's breach. *Western Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992). State Farm argues that it is entitled to

---

*Casualty Co.*, in which the court excluded certain attorney correspondence which was presented for the purpose of establishing "facts relevant to Defendant's handling of Plaintiff's claims." *See* No. 15-cv-01838-WJM-MJW, 2017 WL 1243017, at *4 (D. Colo. Mar. 24, 2017) (finding, in ruling on a motion in limine, that the statements in the attorney's letter were inadmissible hearsay); *see also* ECF No. 49 at 11 (Defendant's motion in limine arguing for exclusion of the August 8, 2022 letter based on *O'Sullivan*).

summary judgment because Plaintiffs cannot establish a breach of any Policy provision and—with respect to any claim concerning actual cash value in particular—because Plaintiffs "never timely provided a sufficient sworn proof of loss or a sufficiently detailed estimate." ECF No. 34 at 14, 16.

However, as the discussion in the preceding section demonstrates, Plaintiffs have come forward with sufficient, competent, contradictory evidence to establish a genuine fact dispute concerning the payment of ACV. The evidence, construed in the light most favorable to them, demonstrates that on August 8, 2022, they transmitted to Mr. Newth—and also to the State Farm Claims department—"a sufficiently detailed estimate" from Charles Taylor that Mr. Newth affirmatively testifies would have been appropriate to use in calculating ACV. Undisputed Fact ¶ 18; *see also* ECF No. 34 at 19. Plaintiffs further have produced evidence indicating that Mr. Newth actually had that estimate in hand by August 8, 2022, or at the very least was on notice that the estimate existed and could have been quickly obtained by contacting Plaintiffs' counsel and asking him to send it.[8] Plaintiffs also have produced competent evidence showing that, had Mr. Newth used the Charles Taylor estimate to perform the reconciliation, Plaintiffs would have received a significantly larger actual cash value payment.

Thus, at a minimum, there is a genuine dispute of material fact as to whether State Farm failed to perform under the Policy by improperly assessing actual cash value—including by failing to take into account an estimate from Plaintiffs, generated two-and-a-half months *before*

---

[8] As Plaintiffs' counsel put the point at oral argument: "And so I think that is another part of the bad faith effort, is that if you know that there's an estimate out there and you didn't get it, say, Hey, Dude, give me the estimate." ECF No. 63 at 55:3-6.

the Hall Ryan estimate, whose importance State Farm has effectively conceded at this stage of the proceedings. ECF No. 34-1 ¶¶ 45-46 (acknowledging that Newth would "probably have used the Charles Taylor estimate for reconciliation and the ACV Payment" if he had it). To the extent State Farm suggests that, as a matter of law, it was relieved of its obligation to properly evaluate and to pay a greater amount of actual cash value because of Plaintiffs' failure to cooperate, *see* ECF No. 34 at 19 (asserting that "Plaintiffs are barred from bringing suit by their own failure to comply with the Policy conditions"), Plaintiffs' effort to put the Charles Taylor estimate before Mr. Newth several months before the October 26, 2022 ACV payment exhibits a genuine dispute concerning any failure-to-cooperate defense.

In summary, in light of the genuinely-disputed material facts concerning both the adequacy and timing of State Farm's payment of ACV, the court does not find summary judgment on Plaintiffs' general breach of contract claim appropriate. The Motion for Summary Judgment is therefore **denied** as to that claim.

> **b.** **Common Law Bad Faith Breach of Contract and Statutory Unreasonable/Delay Denial Claims (Claims One and Two)**

Plaintiffs also bring claims for common law bad faith breach of an insurance contract and statutory unreasonable delay or denial of insurance benefits. ECF No. 4 ¶¶ 39-49. These claims "are specific to disputes arising out of an insurance policy and the insurer-insured relationship," and "are similar, but meaningfully distinct." *Byron-Amen v. State Farm Mut. Auto. Ins. Co.*, No. 21-cv-02364-NYW, 2022 WL 1567563, at *4 (D. Colo. May 18, 2022).

An insured may pursue a claim under § 10-3-1115 when an insurer delays or denies payment of an insurance benefit "without a reasonable basis for that action." Colo. Rev. Stat. § 10-3-1115(2); *see also State Farm Mut. Auto. Ins. Co. v. Fisher*, 418 P.3d 501, 506 (Colo.

2008) (recognizing that § 10-3-1115 imposes a duty on insurers to not "unreasonably delay or deny paying a covered benefit without a reasonable basis for doing so"). Thus, to prove an unreasonable delay or denial under § 10-3-1115, an insured must show (1) the defendant denied or delayed payment of benefits to the plaintiff, and (2) the defendant's denial or delay of payment was without a reasonable basis. Colo. Jury Instr., Civil 25:4; *see also Am. Fam. Mut. Ins. Co. v. Barriga*, 418 P.3d 1181, 1185-86 (Colo. 2018).

A common law claim for bad faith breach of an insurance contract arises out of an insurer's duty of good faith and fair dealing: "Due to the 'special nature of the insurance contract and the relationship which exists between the insurer and the insured,' an insurer's breach of the duty of good faith and fair dealing gives rise to a separate cause of action arising in tort." *Goodson v. Am. Standard Ins. Co.*, 89 P.3d 409, 414 (Colo. 2004) (quoting *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 466 (Colo. 2003)). It resembles a statutory unreasonable-delay-or-denial claim in that both claims require a showing of unreasonable conduct on the part of the insurer. *McKinney v. State Farm Mut. Auto. Ins. Co.*, No. 20-cv-01651-CMA-KLM, 2021 WL 4472921, at *4 (D. Colo. Sept. 30, 2021) ("Under Colorado law, both common law and statutory bad faith claims require a showing of unreasonable conduct.") (citing *Trujillo v. State Farm Mut. Auto. Ins. Co.*, No. 18-cv-0410-WJM-NRN, 2019 WL 3996882, at *8 (D. Colo. Aug. 23, 2019), and *Goodson*, 89 P.3d at 414). However, "[t]he requirements of a common law bad faith claim under Colorado law are heightened in comparison to those of a statutory bad faith claim." *Butman Fam. Inv. Ltd. P'ship v. Owners Ins. Co.*, No. 19-cv-01638-KLM, 2020 WL 1470801, at *8 (D. Colo. Mar. 25, 2020).

In addition to a showing or unreasonable conduct, a common law bad faith claim requires

that the insured establish "both that the insurer acted unreasonably under the circumstances *and* that the insurer knowingly or recklessly disregarded the validity of the insured's claim, while 'the only element at issue in a statutory claim is whether an insurer denied [or delayed] benefits without a reasonable basis.'" *Id.* (quoting *Fisher v. State Farm Mutual Automobile Ins. Co.*, 419 P.3d 985, 990 (Colo. App. 2015), *aff'd*, 418 P.3d 501 (Colo. 2018)) (emphasis in original). "In other words, a common law bad faith claim requires a showing that the insurer *subjectively* knew of, or recklessly disregarded, the unreasonableness of its conduct." *Byron-Amen*, 2022 WL 2567563, at *4 (emphasis in original); *see also Zolman v. Pinnacol Assur.*, 261 P.3d 490, 497 (Colo. App. 2011) (stating that an insurer "will be found to have acted in bad faith only if it has *intentionally* denied, failed to process, or failed to pay a claim without a reasonable basis") (emphasis added).

Scrutinizing the undisputed facts pursuant to these legal standards, the court finds that State Farm is not entitled to summary judgment on either the common law or statutory bad faith claims with regard to any alleged deficiency in the ACV payments.

As for the common law bad faith claim, while it is undisputed that State Farm made an ACV payment to Plaintiffs of almost four hundred thousand dollars on October 26, 2022, the undisputed facts further reveal a significant history preceding that payment. Plaintiffs procured their own estimate and made it available to State Farm on August 8, 2022. Mr. Newth states, in a sworn declaration, that he viewed this estimate as relevant to the reconciliation process. But he did not utilize it, despite being able to secure it within moments of an inquiry to Plaintiffs' counsel. Yet, with Mr. Newth continuing to bear primary responsibility for the adjustment of Plaintiffs' claim, State Farm proceeded to calculate ACV based on the Hall Ryan estimate, which

was not completed for many weeks after State Farm received Plaintiffs' estimate and which

resulted in an alleged underpayment of ACV; indeed, it appears undisputed that the Hall Ryan

estimate generated an ACV payment several hundreds of thousands of dollars lower than would

have resulted from reconciling the Charles Taylor estimate. Moreover, State Farm did not

transmit the ACV payment, based on the later-acquired Hall Ryan estimate, until two-and-a-half

months after Plaintiffs forwarded the Charles Taylor estimate to Mr. Newth and the State Farm

Claims department.

      This history between the parties gives rise to factual disputes that must be resolved by a

jury. As for the common law bad faith claim, viewing the facts in the light most favorable to

Plaintiffs, they have raised a genuine dispute concerning whether State Farm "intentionally

denied, failed to process, or failed to pay a claim without a reasonable basis." *Zolman*, 261 P.3d

at 497. They have come forward with sufficient, competent evidence to establish that State Farm

"acted unreasonably under the circumstances *and* that [State Farm] knowingly or recklessly

disregarded the validity of" Plaintiffs' request for a higher ACV calculation than resulted from

the later-acquired Hall Ryan estimate. *See Fisher*, 419 P.3d at 990 (emphasis added). The

common law bad faith claim thus will require the weighing of evidence and credibility

determinations concerning the parties' conduct and is not appropriate for resolution on a

summary judgment motion. State Farm's Motion is therefore **denied** to the extent Plaintiffs'

common law bad faith claim is based on State Farm's actions with respect to the ACV payment.

      State Farm also is not entitled to summary judgment on Plaintiffs' statutory bad faith

claim, in which the only question "is whether an insurer denied [or delayed] benefits without a

reasonable basis." *See id.* "The reasonableness of the insurer's conduct is determined objectively

and is 'based on proof of industry standards.'" *Schultz v. GEICO Cas. Co.*, 429 P.3d 844, 847 (Colo. 2018) (quoting *Goodson*, 89 P.3d at 415). Here, State Farm argues that "Plaintiffs cannot establish that State Farm violated industry standards," Motion at 17-18, and that testimony from their claims-handling expert is insufficient because his opinions are based solely on his "personal experience." Motion at 17-18. However, for the reasons set forth below, this court respectfully rejects State Farm's argument that the testimony of Plaintiffs' claims handling expert must be excluded, and in any event, whether an insurance company acted reasonably in the handling of a claim for benefits is ordinarily "a question of fact for the jury." *Vaccaro v. Am. Fam. Ins. Grp.*, 275 P.3d 750, 759 (Colo. App. 2012); *see also Ridgeview Ctr. LLC v. Canopius US Ins. Inc.*, No. 18-cv-02850-REB-MEH, 2019 WL 2137394, at *4 (D. Colo. May 16, 2019), *report and recommendation adopted*, 2019 WL 13149200 (D. Colo. Sept. 17, 2019) (observing that "[t]ypically, in cases like this, the parties employ experts to opine whether such conduct aligns with industry standards," and finding that a reasonable juror could find that the insurer acted unreasonably where plaintiff alleged that the claims adjuster was inexperienced in adjusting commercial properties and yet the insurer "relied on his estimate in initially denying and delaying benefits payments").

That baseline standard applies with particular force here, where the genuine issues of material fact detailed above preclude a decision as a matter of law on the reasonableness issue. State Farm's failure to consider the Charles Taylor estimate; Mr. Newth's ready access to the estimate, coupled with his affirmation that he would have used it for reconciliation if he had it; and State Farm's alleged delay and underpayment of ACV are still at issue. The reasonableness of State Farm's conduct, in light of industry standards and all of the evidence in this case, is a

determination that must be made by the jury. *Vaccaro*, 275 P.3d at 759; *Thompson v. State Farm Mut. Auto. Ins. Co.*, 457 F. Supp. 3d 998, 1006 (D. Colo. 2020) ("Where, as here, genuine issues of material fact exist as to the basis for defendant's denial of coverage, reasonableness under the circumstances should be determined by the jury."). The court is therefore unable to determine, as a matter of law, that Defendant is entitled to judgment on Claim Three. For this reason, the Motion for Summary Judgment is respectfully **denied** with respect to Plaintiffs' statutory bad faith claim based on State Farm's actions with respect to the ACV payment.

### 3. Alleged Breach Concerning Denial of Replacement Cost Coverage

The second alleged breach of State Farm's obligations under Coverage A of the Policy rests on the non-payment of replacement cost benefits.

#### a. General Breach of Contract Claim (Claim Three)

The court is mindful of the well-established legal principle that "[e]ach word in an insurance policy should generally be given its ordinary meaning." *Curtis Park Group, LLC v. Allied World Specialty Ins. Co.*, 124 F.4th 826, 832 (10th Cir. 2024) (citing *BonBeck Parker, LLC v. Travelers Indem. Co. of Am.*, 14 F.4th 1169, 1176 (10th Cir. 2021)). Here, the Policy states that "to receive any additional payments on a replacement cost basis, [the insured] must complete the actual repair or replacement of the damaged part of the property within two years after the date of loss[.]" ECF No. 34-1 at 33. State Farm argues that Plaintiffs are not entitled to replacement cost coverage because they indisputably have not restored their home. ECF No. 34 at 17-19; ECF No. 45 at 4-5. The pertinent legal question on summary judgment, however, is not quite so simple as State Farm would have it.

As a general matter, the Spragues would not be entitled to replacement cost coverage

because they have not performed the repairs, but that general rule operates "only to the extent [State Farm's] behavior did not prevent [the Spragues] from making these repairs." *See Am. Ins. Co. v. Pine Terrace Homeowners Ass'n*, No. 20-cv-00654-DDD-MDB, 2023 WL 6796163, at *5 (D. Colo. June 12, 2023). As the court in *Pine Terrace* explained, the contract principle known as the "prevention doctrine" may absolve an insured from compliance with the terms of a policy "if it can show that [the insurer] prevented it from fulfilling [a] contractual condition." *Id.* (citing *New Design Constr. Co. v. Hamon Contractors Inc.*, 215 P.3d 1172, 1184 (Colo. App. 2008)).

"The prevention doctrine is a generally recognized principle of contract law that provides that if one party prevents or hinders the other party's ability to perform, the other party's failure to perform is excused." *Baroness Small Estates., Inc. v. Round Hill Cellars*, No. 10-cv-01999-MSK-CBS, 2011 WL 6152969, at *4 (D. Colo. Dec. 12, 2011). The doctrine rests on the equitable premise that, "[w]hen a promisor is [itself] the cause of the failure of performance of a condition upon which his own liability depends, [it] cannot take advantage of that failure." *Montemayor v. Jacor Commc'ns, Inc.*, 64 P.3d 916, 920 (Colo. App. 2002) (quotation omitted). "Indeed, 'the duty of good faith owed by the insurer to the insured requires that it not act to prevent the occurrence of conditions to its performance.'" *Copper Creek Inc. v. State Farm Fire & Cas. Co.*, No. 21-cv-01603-NYW-MEH, 2022 WL 17454493, at *9 (D. Colo. Dec. 6, 2022) (quoting *Dupre v. Allstate Ins. Co.*, 62 P.3d 1024, 1028 (Colo. App. 2002)). As one court in the Tenth Circuit has recognized, "the clear trend of authority" in the insurance context "is that when an insurer hinders an insured's ability to repair or replace its property by refusing to pay a claim *or underpaying a claim*, the failure to repair or replace the property may be excused, at least until liability is determined." *Corrales Ventures, LLC v. Union Ins. Co.*, No. 1:20-cv-00872-LF-SCY,

2023 WL 402124, at *3 (D.N.M. Jan. 25, 2023) (collecting cases) (emphasis added). The court understands the Spragues to invoke the prevention doctrine here, in that they allege they "have not started to restore the Property because State Farm paid Plaintiffs insufficient funds [in connection with the October 26, 2022 ACV payment] to go under contract to restore the Property," and further, because State Farm "informed Plaintiffs it would not pay Forge & Bow invoices as they were incurred because the construction would not be completed within twenty-four months of the loss." ECF No. 38 ¶ 65; *id.* ¶ 54 (referencing the significantly larger numbers in the Charles Taylor and Forge & Bow Estimates in comparison with the replacement cost in the Hall Ryan estimate, on which State Farm calculated ACV benefits).

Mr. Sprague avers that, during a meeting at the Spragues' property on July 27, 2023, State Farm representative Kimberly Templeman told the Spragues that, because restoration work could not be completed within twenty-four months of the February 2022 loss, State Farm would not pay for restoration costs. ECF No. 38-2 ¶ 50. State Farm, through Mr. Newth, disputes that Ms. Templeman made any such statement, and asserts that she told the Spragues—notwithstanding the explicit Policy language requiring the insured to "complete the actual repair or replacement of the damaged part of the property within two years after the date of loss," ECF No. 34-1 at 15—that they only needed to go "under contract" for restoration "before the two-year anniversary of the loss." ECF No. 34-1 ¶ 52. Mr. Newth further states that the "policy puts a two-year limit on RCB benefits. But State Farm *sometimes* allows policyholders to have the benefit as long as they have the restoration under contract within the two-year period." *Id.* ¶ 8 (emphasis added).

This record, construed in Plaintiffs' favor, reveals a material fact dispute about whether

the Spragues were informed that their claim fell in that "sometimes" category of instances in which State Farm would excuse rigorous enforcement of the Policy's two-year time limit to complete restoration. Mr. Sprague, who was present during the July 27, 2023 conversation, denies that anyone at State Farm told the Spragues that going "under contract" within the two-year timeframe would be sufficient. ECF No. 38-1 ¶ 50. State Farm argues that all evidence about the conversation should be excluded because it was "between Mr. Athey and Ms. Templeman," and "Mr. Athey is not available for cross-examination" and the Spragues only "vaguely" remember the conversation, ECF No. 49 at 12, but the court finds no basis for exclusion of the evidence on those grounds. The precise recollection of the participants, all of whom were indisputably present, is subject to dispute—"that was not the conversation we had," according to Mr. Sprague, *see* ECF No. 38-1 ¶ 50—and the Spragues can testify to their understanding of what transpired. They can also cross-examination Ms. Templeman and Mr. Newth about the matter. And to the extent State Farm thinks the Spragues did not hear or comprehend what Ms. Templeman actually said, *see* ECF No. 49 at 9, that point warrants vigorous cross-examination at trial, not exclusion of the evidence, especially at the summary judgment stage.

Viewing this record in Plaintiffs' favor, the court finds that a reasonable juror could conclude that State Farm prevented Plaintiffs from fulfilling the contractual repair/replace provision in the Policy by telling them in July 2023 that—because it was impossible to complete the restoration in the remaining seven months before February 2024—State Farm would not pay for it. *See Utica Mut. Ins. Co. v. Cincinnati Ins. Co.*, 362 F. Supp. 3d 265, 268 (E.D. Pa. 2019) (recognizing that courts "routinely apply the doctrine of prevention to replacement requirements

that leave the insured in a 'no win' situation, whereby '[t]he insured, in order to recover under the replacement cost coverage he or she purchased, would have to incur the cost of repairs and replacements when there is no guarantee that a future breach of contract action by the insured will be successful'") (quoting *D & S Realty, Inc. v. Markel Ins. Co.*, 816 N.W.2d 1, 14 (Neb. 2012)). This court is not a factfinder and therefore is not in a position to definitively determine that State Farm affirmatively prevented Plaintiffs from completing the necessary repairs and restoration, and it recognizes that Plaintiffs would not have been entitled to receive benefits under the Policy until the repairs and restoration had been completed. But if a factfinder concludes that State Farm declared it would not pay—or if it finds that Plaintiffs were owed additional ACV benefits under the Policy, and that State Farm's refusal to pay those additional benefits prevented the Spragues from going under contract to complete the work—Plaintiffs may be able to establish that they are entitled to additional compensation under the Policy, irrespective of the fact that no restoration has taken place. *See Royal Crest Dairy, Inc. v. Cont'l W. Ins. Co., a Corporation*, No. 17-cv-00949-RM-KLM, 2024 WL 404485, at *11 (D. Colo. Feb. 2, 2024) (holding that, in a situation in which a factfinder could conclude that the insurer did "owe additional benefits under the policy, and if it also finds that [the insurer's] refusal to pay those additional amounts prevented [the plaintiff] from proceeding by, for example, preventing it from obtaining financing for the work, [the plaintiff] would have an argument that it is entitled to compensation for the increased costs caused by such a wrongful delay").

Here, there is sufficient, competent evidence in the record to show that issues of material fact give rise to a genuine dispute on these critical points. A reasonable juror could conclude that the payment of ACV—which Mr. Newth acknowledges could have been based on the Charles

Taylor estimate—prevented the Spragues from going under contract to complete the restoration and, further, that Plaintiffs did not violate their obligations under the Policy by deciding not to risk incurring unreimbursible out-of-pocket expenditures of hundreds of thousands of dollars; by ceasing all apparently futile restoration efforts; by filing a lawsuit; and by proceeding with the purchase of another house. In these circumstances, a reasonable juror could determine that the Spragues may still recover the replacement cost value for their home. *See Pine Terrace*, 2023 WL 6796163, at *5 (denying summary judgment where party alleged that the filing of a lawsuit prevented it from making certain repairs, notwithstanding a policy provision which stated that the insurer 'will not pay on a replacement cost basis . . . [u]ntil the lost or damaged property is actually repaired and replaced'"); *cf. Copper Creek*, 2022 WL 17454493, at *9-10 (granting summary judgment in favor of insurer where plaintiff "cite[d] no record evidence" to support its argument that State Farm's actions prevented it from meeting the two-year replacement deadline in the policy, and the plaintiff did not clearly argue that any "delay in payment has prevented it from full replacement due to financial constraints"). In contrast with *Copper Creek*, the record here contains sufficient competent evidence to put the question of prevention-of-performance in the jury's hands.

The court finds that the authority on which State Farm relies does not compel a different conclusion at the summary judgment phase. State Farm argues that *Taylor v. State Farm Fire & Cas. Co.*, No. CIV-21-15-C, 2022 WL 1434654 (W.D. Okla. May 5, 2022), "controls the outcome here," ECF No. 34 at 18, but this court discerns significant factual differences between that unpublished decision from another federal district court and the case at hand. For one thing, in *Taylor*, State Farm actually "attempted to reconcile the differences" between an estimate it

had procured and a higher estimate the plaintiffs had provided, *see* 2022 WL 1434654, at *2, unlike here, where the record demonstrates that Mr. Newth acknowledged the relevance of the higher Charles Taylor estimate but made no attempt to use it "for reconciliation and the ACV Payment." ECF No. 34-1 ¶¶ 45-46. And in further contrast with the instant case, in *Taylor*, State Farm made a continuing, concerted effort "to reconcile the differences between Defendant's estimate of the cost and Plaintiffs' estimate," and the plaintiffs wholly failed to respond to State Farm's requests for additional information "at least seven times." *See* 2022 WL 1434654, at *2; *see also id.* (finding that, under those facts, including the plaintiffs' failure to complete repairs within the two-year policy deadline, "Plaintiffs cannot show Defendant breached the contract by not paying Coverage B benefits").[9] Here, while State Farm attempts to ascribe delay to Plaintiffs, the court finds that those assertions are subject to genuine dispute, *see* ECF No. 38 ¶¶ 28, 29, 35, 40, 41, 45, and that the only undisputed refusal by Plaintiffs to provide information occurred after the July 27, 2023 meeting. *Id.* ¶ 52.

In light of these significant distinctions, this court discerns no pertinent factual connection between *Taylor* and this matter that supports entry of summary judgment under the circumstances present here. The court is similarly unpersuaded to find that summary judgment is appropriate based on the other authority on which State Farm primarily relies. At oral argument, State Farm pointed the court to *Canyon Springs at Soaring Eagles Townhome Owners Ass'n v. Country Mut. Ins. Co.*, 819 Fed. App'x 663 (10th Cir. 2020), and *BonBeck Parker, LLC v. Travelers Indem. Co. of Am.*, 611 F. Supp. 3d 1115 (D. Colo. 2020), *aff'd*, 14 F.4th 1169 (10th

---

[9] The policy in *Taylor* appears to have placed replacement cost benefits for a dwelling under the umbrella of "Coverage B," rather than Coverage A. *See* 2022 WL 1434654, at *2.

Cir. 2021), as support for the proposition that an insured's failure to perform repairs within the timeframe required by a policy precludes recovery of replacement cost benefits.[10] While both of those cases support that proposition as a general matter, neither addresses or resolves the fundamental question with which the court must grapple here: whether restoration was required in order for Plaintiffs to pursue a claim for replacement cost benefits, where there is a dispute about whether the amount of the ACV payment effectively prevented them from proceeding with the restoration and a contention—which the court must accept for purposes of summary judgment—that a State Farm official affirmatively represented that replacement costs would never be paid because restoration could not be completed within the two-year Policy period.

Based on the evidence presented, and in light of these unaddressed questions, the court cannot at this juncture find that State Farm is entitled to judgment as a matter of law on Plaintiffs' general breach of contract claim with respect to RCV. The Motion for Summary Judgment therefore is **denied** as to that claim.

### b.      Bad Faith Claims (Claims One and Two)

For the same reasons the court finds summary judgment unwarranted on Plaintiffs' breach of contract claim, it likewise finds that genuine issues of material fact preclude summary judgment on their bad faith and unreasonable delay claims associated with an alleged failure to pay replacement cost value. Viewing the facts in the light most favorable to Plaintiffs, there is conflicting evidence in the record that precludes a finding that State Farm's actions were indisputably reasonable as a matter of law. Based on the current record, then, the court cannot rule out the possibility that a reasonable jury could find that State Farm acted unreasonably, or

---

[10] State Farm did not cite either case in the Motion for Summary Judgment or its reply brief.

recklessly, in handling Plaintiffs' claims with respect to its replacement cost obligations under the Policy. *See Thompson*, 457 F. Supp. 3d at 1003 ("Whether an insurer's conduct was reasonable under the circumstances is ordinarily a question of fact for the jury when conflicting evidence exists.") (citing *Zolman*, 261 P.3d at 497); *see also Fisher*, 419 P.3d at 990 (setting forth elements of statutory and common law bad faith claims). It is thus for the jury, and not this court, to examine "the entire course" of conduct between the Spragues and State Farm. *Pham v. State Farm Mut. Auto. Ins. Co.*, 70 P.3d 567, 572 (Colo. App. 2003) (holding that "[b]ad faith breach of an insurance contract encompasses the entire course of conduct and is cumulative").

Accordingly, summary judgment is **denied** with respect to Plaintiffs' statutory and common law bad faith claims that challenge State Farm's non-payment of replacement cost benefits.

*       *       *

In light of the material facts at issue, Defendant's Motion for Summary Judgment is respectfully **denied** as to all of Plaintiffs' breach of contract claims—premised on theories of general breach and statutory and common law bad faith—under Coverage A.

### B.    Alleged Breach Concerning Coverage B

Under Coverage B of the Policy, Plaintiffs are entitled to compensation to repair or replace their personal property subject to certain conditions, including the preparation of an "inventory showing in detail the quantity, description, age, replacement cost, and amount of loss," and "attaching all bills, receipts, and related documents that substantiate the figures in the inventory." ECF No. 34-1 at 34-35. State Farm, through Mr. Newth, asserts that "the only Personal Property the Spragues documented in accordance with the Policy terms was an old

piano, and State Farm paid related benefits of more than $36,000." ECF No. 34-1 ¶ 61. Mr.

Newth further states that State Farm "has not denied any requests for coverage under coverage

B." *Id.* ¶ 64.

Plaintiffs, however, dispute these assertions. According to Mr. Sprague, Mr. Newth told

the Spragues that they were not obliged to strictly comply with the inventory requirement under

the Policy; instead, "State Farm's software" would help them manage the inventory process:

> State Farm refused to pay us Coverage B benefits for damaged personal property
> after we followed Michael Newth's directions and submitted a list of property that
> we completed to the best of our ability and access to documentation. We cannot
> locate receipts or determine the values of the vast majority of the personal items
> damaged by the loss, and State Farm has refused to help us determine these values
> even though Michael Newth told us State Farm's software would manage this
> process for us.
>
> We have submitted detailed documentation, including receipts, for certain items in
> addition to the piano, including an Ethan Allen dining set.
>
> Additionally, we cannot replace all of the personal property and we will not have
> space to store the personal property until the restoration is complete.

ECF No. 38-1 ¶¶ 55-57. The "list" to which Mr. Sprague refers, enumerating approximately

eighty items of personal property, is appended to Plaintiffs' response to the Motion for Summary

Judgment. State Farm argues that the list is not admissible evidence, ECF No. 45-1 ¶ 61, but for

purposes of summary judgment, the court finds otherwise. The list—or its contents—can readily

be submitted in a form that would be admissible at trial. *Argo*, 452 F.3d at 1199. The record also

does not support State Farm's characterization of the list as contrary to Mr. Sprague's "own

admission that the list of personal property . . . was insufficient." ECF No. 45-1 ¶ 61. Without

question, Mr. Sprague acknowledged in his deposition that the list did not include a replacement

cost or amount of loss for each item, and that it did not "attach bills, receipts, and related documents." ECF No. 34-2 at 155:13-19. Mr. Sprague, however, went on to testify: "*Newth was supposed to give me those numbers*," generated by means of software in the possession of State Farm. *Id.* at 155:19-20 (emphasis added); ECF No. 38-1 ¶ 55. There appears to be no dispute that Mr. Newth did not, in fact, give Mr. Sprague those numbers or otherwise assist the Spragues in utilizing State Farm's software to generate values for the lost or damaged property on the list— as Mr. Sprague states, in a sworn declaration, Mr. Newth said he would do.

State Farm argues that the Spragues' "own understandings do not modify the policy language, the factual statements of Mr. Newth, or their own testimony." ECF No. 45-1. True, the evidence to which Plaintiffs point does not alter other aspects of the record; that evidence remains as it is. But Plaintiffs have presented *additional* evidence sufficient to show that they made efforts to abide by the terms of the Policy with regard to Coverage B, in reliance on Mr. Newth's statement that the software "would manage the process for [them]" and that Mr. Newth would generate the numbers. ECF No. 38-1 ¶ 55. Nothing in the record indicates that Mr. Newth, or anyone else at State Farm, did either of these things.

Based on this evidence, a reasonable factfinder could reject State Farm's contentions that the Spragues only "sufficiently documented" damage to "an old upright piano" for purposes of Coverage B, and that "State Farm has not denied any requests for coverage under coverage B." ECF No. 34-1 ¶¶ 61, 64. Instead, a reasonable juror could conclude that the Spragues made a good-faith effort to provide State Farm with all the information they could obtain about their personal property and that they substantially complied with the Policy requirements. *See* ECF No. 38 at 41 (asserting that "Plaintiffs substantially complied with the terms of the policy before

bringing the instant lawsuit"); *see also* Colo. Jury Instr., Civil 30:10 (to establish a breach of

contract, the plaintiff must establish that they "substantially complied" with the contract terms);

*Hale v. State Farm Fire & Cas. Co.*, No. 22-2291, 2025 WL 40549, at *8 (4th Cir. Jan. 7, 2025)

(finding, in reversing the district court's grant of summary judgment in favor of State Farm in a

dispute over a Coverage B claim, that "State Farm did not pay Hale for every item of personal

property that he claimed was destroyed, and it sometimes paid less than the value assessed by

Hale. Because Hale as property owner is competent to testify to the value of his own property,

the record shows a genuine issue of fact as to whether State Farm paid Hale the full amount

required by the policy. State Farm therefore failed to show its entitlement to summary judgment,

and the district court erred by granting it."). Too, this record, construed in Plaintiffs' favor,

evinces a genuine dispute concerning whether State Farm's actions—including an unfulfilled

promise by the assigned adjuster to facilitate the estimation of items of personal property for

which the Spragues had no ability to obtain documentation—served "to prevent the occurrence

of conditions to its performance." *Dupre*, 62 P.3d at 1028 (summary judgment for insurer

reversed where issue existed as to whether insurer was equitably estopped from relying on

insured's failure to fulfill a condition as defense to a claim) (citing *Navajo Freight Lines, Inc. v.

Moore*, 463 P.2d 460, 462 (1970) ("it is a principle of fundamental justice that if a promisor is

himself the cause of the failure of performance of a condition upon which his own liability

depends, he cannot take advantage of that failure"); Restatement (Second) Contracts § 245 cmt. a

(1981) ("Where a duty of one party is subject to the occurrence of a condition, the additional

duty of good faith and fair dealing . . . may require some cooperation on his part, either by

refraining from conduct that will prevent or hinder the occurrence of that condition *or by taking*

*affirmative steps to cause its occurrence.*") (emphasis added)).

Contrary to State Farm's arguments, the record concerning Coverage B does not indisputably show that State Farm did not breach any of the Policy requirements, nor does it unquestionably show that its conduct was reasonable under the circumstances. The court finds that genuine issues of material fact remain regarding both points. To countenance State Farm's view, the court would be obliged at this stage to determine the credibility of witnesses and to decide "the weight to give each piece of the evidence," but "that job must fall to the jury, who is best positioned to make such determinations." *Foote v. State Farm Fire & Cas. Co.*, No. 20-cv-02342-RMR-MEH, 2023 WL 8780763, at *4 (D. Colo. Dec. 19, 2023) (citing *Excel Constr. Grp. v. GuideOne Mut. Ins. Co.*, No. 20-cv-03848-RMR-SKC, 2023 WL 2574373, at *2 (D. Colo. Mar. 20, 2023)).

Summary judgment in favor of State Farm is not appropriate on Plaintiffs' breach of contract and common law and statutory bad faith claims as they relate to decisions concerning Coverage B. State Farm's Motion seeking summary judgment as to those claims is therefore **denied**.

### C.    Alleged Breach Concerning Coverage C

The summary judgment record with regard to benefits under Coverage C—alternate living expenses—is sparse. Mr. Newth avers that the Policy "provides coverage for properly documented . . . alternate living expenses (ALE) under coverage C cause by named perils," and that "ALE is only available if incurred." ECF No. 34-1 ¶ 9. He further states that State Farm paid the Spragues "alternative living expenses under Coverage C when they were requested, including for a hotel in March [2022] and for temporary heaters in June [2022]," and that "State Farm has

not denied any requests for coverage under coverage C." *Id.* ¶ 40, 65. Reduced to its essence, then, the court understands State Farm's argument to be that the Spragues cannot present any facts from which a jury could determine State Farm failed to pay Coverage C benefits, or unreasonably delayed payment of Coverage C benefits so as to support a statutory or common law bad faith claim.

From Plaintiffs' evidentiary presentation, the court has identified only one specific, properly-supported fact concerning an alleged breach with regard to Coverage C. Per Mr. Sprague's declaration:

> State Farm did not pay us alternate living expenses under Coverage C when we requested them. For example, we requested $32,695.47 on May 15, 2023, for costs for a temporary apartment constructed in our barn. State Farm did not reimburse us for these costs until May 28, 2024, when my attorney finally received a check mailed by State Farm in that amount. Essentially, we had to file a lawsuit to obtain this benefit.

ECF No. 38-1 ¶ 58.

Although this delayed payment purports to be just one "example" of an alleged breach of State Farm's obligations under the Coverage C provision of the Policy, the court has culled the record and finds that it is the only instance that Plaintiffs have attempted to support with competent evidence. They have not clearly identified any evidence that might support any other claim for breach of contract in connection with Coverage C. This court "cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record"—and that is so even when a party is proceeding pro se. *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005). Here, Plaintiffs have been represented by able counsel since the beginning of the case. *See Cousik v. City & Cnty. of Denver, Colo.*, No. 22-cv-

01213-NYW-KAS, 2024 WL 4267880, at *6 (D. Colo. Sept. 23, 2024) (stating that a court "may not speculate about or craft arguments for Plaintiffs that they did not raise in opposition to Denver's Motion for Summary Judgment—particularly given the fact that they have been represented by able counsel since the inception of this case") (citing *United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015) ("[I]t is not this court's duty, after all, to make arguments for a litigant that he has not made for himself."); *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) (observing that a court has no obligation to make arguments or perform research on behalf of litigants)).

Focusing solely on the evidence that Plaintiffs have presented, their claim for general breach of contract under Coverage C rests not on a failure to pay benefits owed, but rather on a delay in making one payment under the Policy. Recall that to prevail on a claim for breach of contract under Colorado law, Plaintiffs must prove: (1) the existence of a contract; (2) their performance under the contract; (3) State Farm's failure to perform and/or breach; and (4) resulting damages. *See Xtreme Coil Drilling Corp. v. Encana Oil & Gas (USA), Inc.*, 958 F. Supp. 2d 1238, 1243 (D. Colo. 2013) (citing *Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992)). With respect to Coverage C, Plaintiffs have failed to raise a genuine dispute that any contractual obligation was breached.

The record reflects no dispute that State Farm paid the Spragues for the costs they incurred in connection with the construction of a temporary apartment. While they allege—and the court takes as true for purposes of evaluating the Motion for Summary Judgment—that it took State Farm one full year to make this payment, Plaintiffs do not point to a specific Policy provision that obliged State Farm to make a *faster* payment. Based on its own examination of the

record, the court observes that the Policy contains a provision concerning "Loss Payment," stating that a "loss will be payable 60 days after we receive your proof *and* (a) reach agreement with you; (b) there is an entry of a final judgment; or (c) there is a filing of an appraisal award with us." ECF No. 34-1 at 37 (cleaned up; emphasis added). However, Plaintiffs do not invoke this provision, nor have they come forward with sufficient evidence to show that any of the three conditions for payment in this provision were triggered more than sixty days before State Farm made the reimbursement in May 2023.

In short, Plaintiffs have failed to identify any facts demonstrating a genuine dispute as to whether State Farm breached a *contractual obligation* under the circumstances here, where there is no dispute that Plaintiffs were paid the full amount of Coverage C benefits—albeit some months after they initially sought reimbursement. It necessarily follows that, since Plaintiffs have been paid the full amount of Coverage C benefits owed, they have not shown that they sustained damages attributable to a *contractual breach*. *Cf. Roberts v. State Farm Mut. Auto. Ins. Co.*, No. 19-cv-00319-NYW, 2019 WL 5063469, at *4-5 (D. Colo. Oct. 9, 2019) (rejecting the position that "every finding of undue delay would necessarily also be a breach of contract"). And because State Farm has paid the full Coverage C benefits owed to the Spragues, there is no genuine dispute that State Farm has not breached the Policy with respect to payment of alternate living expenses. The court thus **grants** the portion of State Farm's Motion for Summary Judgment insofar as it seeks judgment in its favor as to a general breach of contract claim related to Coverage C benefits. This conclusion, however, is not dispositive of Plaintiffs' statutory and common law bad faith claims arising from a delay in payment under Coverage C.

"Common law and statutory claims premised on the unreasonable delay in payment of

benefits arguably survive dismissal of the underlying breach of contract claim." *Trujillo*, 2019 WL 3996882, at *8 (citing *Goodson*, 89 P.3d at 414) ("Therefore, the fact that an insurer eventually pays an insured's claims will not prevent the insured from filing suit against the insurer based on its conduct prior to the time of payment."), and *Barriga*, 418 P.3d at 1185). As previously discussed in this Order, both common law and statutory bad faith claims require Plaintiffs to show that State Farm's conduct was unreasonable, and the common law bad faith claim also requires a showing that State Farm acted with knowledge or reckless disregard of the consequences of its actions. *See id.*

State Farm does not specifically address or present evidence concerning the one-year interval between Plaintiffs' request for benefits under Coverage C and State Farm's payment of the entire amount requested. Mr. Newth does not speak to the issue in his declaration, nor does State Farm mention it in its reply briefing, which continues to emphasize that Plaintiffs' claims are cabined by their alleged decision to seek only replacement cost benefits under Coverage A. *See generally* ECF No. 45; *see also* ECF No. 45-1 (asserting that "Plaintiffs double down on the facts described below—that they are only seeking replacement cost benefits under Coverage A"). But as the court previously has explained, the record does not support State Farm's proclamation that Plaintiffs' claims are limited in this manner.

As the record stands, Plaintiffs have come forward with evidence showing that State Farm delayed an entire year in remitting more than thirty thousand dollars as reimbursement for a legitimate claim of alternate living expenses. State Farm has introduced no countervailing evidence that might justify that delay, including, for example, evidence demonstrating a failure by Plaintiffs to submit "receipts for additional living expenses incurred." *See* ECF No. 34-1 at

35. The court will not speculate about the content of arguments or evidence State Farm might have submitted on this point, but did not. *Cousik*, 2024 WL 4267880, at *6. The record thus does not indisputably show that State Farm acted reasonably under the circumstances. Viewing the facts in the light most favorable to Plaintiffs, the court finds that genuine issues of material fact remain regarding the reasonableness of State Farm's actions in response to Plaintiffs' request for reimbursement of construction costs for their temporary apartment. Based on this record, the court cannot rule out the possibility that a jury would find that State Farm's conduct in this regard was unreasonable, or that State Farm knew or recklessly disregarded the fact that its conduct was unreasonable.

Accordingly, the court **denies** State Farm's Motion for Summary Judgment on the Spragues' common law and statutory bad faith claims arising out of the delay in issuing the $32,695.47 reimbursement payment under Coverage C in May 2024.

## II.   MOTIONS TO EXCLUDE OPINION TESTIMONY

State Farm brings two motions seeking to exclude opinion testimony: a "Motion to Exclude Cost Estimation Opinions Pursuant to F.R.E. 702 and F.R.C.P. 37," including in particular the testimony of Darwin Cooprider, the Director of Building Consulting for Charles Taylor, ECF No. 33 ("Cost Opinion Motion"), and a "Motion to Exclude Opinions of Stephen Collins Pursuant to F.R.E. 702," ECF No. 35 ("Collins Motion").

### A.   Legal Standards

#### 1.   Rule 702

The recently-amended Rule 702 of the Federal Rules of Evidence, which governs the testimony of expert witnesses, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> > **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > **(b)** the testimony is based on sufficient facts or data;
> >
> > **(c)** the testimony is the product of reliable principles and methods; and
> >
> > **(d)** the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702 (as amended Dec. 1, 2023). Where, as here, a party challenges the admissibility of the opinions of an expert witness, Rule 702 "imposes upon the trial judge an important gate-keeping function with regard to the admissibility of expert opinions." *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1307 (10th Cir. 2015) (citation and quotation omitted). The proponent of expert testimony bears the burden of showing admissibility by a preponderance of the evidence. Fed. R. Evid. 702, advisory committee note to 2000 Amendment (under Rule 702, the "proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence") (citing *Bourjaily v. United States*, 483 U.S. 171 (1987)); *accord Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013).

To evaluate admissibility, the court engages in a "two-step analysis." *Roe v. FCA US LLC*, 42 F.4th 1175, 1180 (10th Cir. 2022). First, the court must decide whether the proffered expert is qualified "by knowledge, skill, experience, training, or education" to render the opinion. Fed. R. Evid. 702; *see also Roe*, 42 F.4th at 1180. Second, if the expert is sufficiently qualified, the court must determine whether the proffered opinions are reliable. *Roe*, 42 F.4th at 1180-81. "The reliability inquiry asks whether the methodology employed by an expert is valid—that is, whether it is based on sufficient data, sound methods, and the facts of the case." *Id.* at 1181

(citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). The court's gatekeeping function "is a flexible and commonsense undertaking in which the trial judge is granted 'broad latitude' in deciding both how to determine reliability as well as in the ultimate decision of whether the testimony is reliable." *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1243 (10th Cir. 2000) (quoting *Kumho Tire*, 526 U.S. at 141-42). The court also evaluates whether the expert reliably applied the methodology to the facts of the case. Fed. R. Evid. 702(d). Experience alone may provide a sufficient foundation for expert testimony, but a witness relying solely on experience must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee note to 2000 amendment. The court's "gatekeeping function requires more than simply taking the expert's word for it." *Id.* (citation and quotation omitted).

However, the court's role as a gatekeeper "is not intended to serve as a replacement for the adversary system." *Id.* (quoting *United States v. 14.38 Acres of Land Situated in Leflore Cnty., Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993). And the court has substantial discretion to determine "*how* to perform its gatekeeping function under *Daubert*." *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019) (emphasis in original); *see also Roe*, 42 F.4th at 1180. In the end, "[t]he rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee note to 2000 amendment.

### 2.  Rule 37

Rule 37(c) of the Federal Rules of Civil Procedure governs violations of Rule 26(a)(2).

Rule 37(c)(1) provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
>> (B) may inform the jury of the party's failure; and
>> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(iv).

Fed. R. Civ. P. 37(c)(1). The determination as to whether a violation of Rule 26(a) is justified or harmless is entrusted to the broad discretion of the court. *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999). In exercising this discretion, the court's analysis is guided by the following four factors: (1) the prejudice or surprise to the impacted party; (2) the ability to cure the prejudice; (3) the potential for trial disruption; and (4) the erring party's bad faith or willfulness. *Id.* In seeking to avoid a preclusion sanction, the party responsible for a Rule 26(a) violation bears the burden of showing the failure was substantially justified or harmless. *Sender v. Mann*, 225 F.R.D. 645, 655 (D. Colo. 2004) (citation omitted); *Bettmann v. Owners Ins. Co.*, 22-cv-03313-REB-STV, 2024 WL 1829263, at *5 (D. Colo. Feb. 12, 2024) (same).

### B.  Analysis

### 1.  Cost Opinion Motion

In this motion, State Farm seeks to exclude "all cost estimation opinions offered by

Plaintiffs, including those of their retained expert witness, Darwin Cooprider." ECF No. 33 at 4. Other than Mr. Cooprider, the court understands State Farm's request for exclusion primarily to encompass all testimony related to the Forge & Bow estimate presented to State Farm in July 2023. *See id. passim* (arguing that the Forge & Bow estimate should not be considered). The court frames its analysis accordingly.

### a.    Mr. Cooprider's Opinions

It is necessary to lay out the chronology that serves as the prelude to State Farm's demand that Mr. Cooprider not be allowed to testify[11]:

- On July 26, 2022, Charles Taylor provided an estimate of repair for the residence to the Spragues' counsel. ECF No. 33-5 at 65 (timeline of Stephen Collins, referencing document bates-numbered STATE FARM_002610-002655). Charles Taylor estimated the replacement cost value of repairs to the residence as $959,495.74, with an actual cash value repair cost of $912,444.45. *Id.*

- On August 8, 2022, counsel for Plaintiffs sent to Mr. Newth and the State Farm Claims department the letter stating that the Charles Taylor estimate—reflecting an "Xactimate Net Claim" of $959,495.74—was enclosed. ECF No. 38-3 at 64.

- On March 20, 2024, State Farm served a subpoena on Charles Taylor seeking, in essence, all documents related to its work in connection with the Spragues' residence. ECF No. 33-11.

- On March 29, 2024, counsel for Plaintiffs informed counsel for State Farm that Plaintiffs intended to disclose Charles Taylor—specifically, Mr. Cooprider—as an expert. ECF No. 33-12 at 13.

- On April 1, 2024, counsel for State Farm agreed, at the request of counsel for

---

[11] The court considers all information that reasonably may be derived from the record in deciding the motions to exclude, including the representations of counsel at the oral argument.

Plaintiffs, "to drop the subpoena and receive [the Charles Taylor] file in the normal course of civil procedure." ECF No. 33-12 at 13.

- While State Farm's counsel apparently expected Plaintiff's counsel to promptly produce the documents requested in the withdrawn subpoena, *see* ECF No. at 39-3 at 17:15-17, that did not happen, and there appears to be no dispute that State Farm's counsel did not press for the documents or issue a discovery request for them.

- On June 21, 2024, Plaintiffs formally disclosed Mr. Cooprider as a retained expert pursuant to Federal Rule of Civil Procedure 26(a)(2)(B). ECF No. 33-5. Plaintiffs disclosed Mr. Cooprider's curriculum vitae, which included his deposition testimony in the last four years and his consulting rate sheet, along with a "Cost of Repair Report" which set forth the Xactimate calculations estimating a replacement cost value of $959,495.74—the same number Mr. Athey had conveyed to State Farm in the letter dated August 8, 2022. *Id.* at 20-58.

- The June 21, 2024 disclosure of Mr. Cooprider also included, in error, a cover report from Charles Taylor about winterizing the Spragues' residence. *Id.* at 18; *see also* ECF No. 63 at 104:4-8 (explanation by Mr. Athey that he was responsible for this error).

- State Farm took Mr. Cooprider's deposition on September 12, 2024. At that time, counsel for State Farm first complained that Plaintiffs had not produced Mr. Cooprider's file. ECF No. 63 at 105:1-9. Also on that date, Mr. Athey realized for the first time that he had inadvertently attached the winterization report to Mr. Cooprider's disclosures. *See id.*

- During Mr. Cooprider's deposition, counsel mutually agreed to seek an extension of the discovery period to allow time for the Spragues to produce Mr. Cooprider's file and to permit State Farm sufficient time to reopen and complete Mr. Cooprider's deposition after reviewing his file. *Id.* at 105:9-12.

- Plaintiffs subsequently produced Mr. Cooprider's file, but State Farm did not reopen his deposition. Instead, State Farm filed the instant motion on October 22, 2024, seeking to preclude Plaintiffs from presenting all "cost estimation opinions." *Id.*

As a preliminary matter, it is apparent that the dispute about Mr. Cooprider's testimony might have been resolved if the attorneys had continued to communicate after Mr. Cooprider's deposition. The record confirms that Mr. Athey, the Spragues' attorney, was willing to immediately produce Mr. Cooprider's working file. Mr. Athey might have done so without further prompting from State Farm's counsel after the subpoena was withdrawn, but it is also the case that State Farm's attorney waited almost *six months* after withdrawing the subpoena to press the point. It is also clear from the record that when Mr. Athey realized—on the morning of Mr. Cooprider's deposition—that he had mistakenly attached to Mr. Cooprider's disclosures a report about the unrelated topic of winterization of the Spragues' residence, he immediately tried to set things right by making Mr. Cooprider available for additional deposition time to clear up any confusion in the record. Instead of agreeing to that reasonable proposal, however, counsel for State Farm filed the Cooprider Motion.

### i.      Whether Mr. Cooprider's Opinions are Admissible

The court first addressees State Farm's foundational contention that testimony on the topic of cost estimation generally, and from Mr. Cooprider specifically, must be excluded because it is not relevant to any element of Plaintiffs' claims.

State Farm reiterates the argument it pressed in seeking summary judgment, that "Plaintiffs do not contest the amount of ACV or other benefits paid and cannot establish entitlement to replacement cost benefits because they have not rebuilt." ECF No. 43 at 5 (citing *Taylor*, 2022 WL 1434654, at *2); *see also id.* at 9-11 (arguing that "cost estimation opinions are not relevant to any element of Plaintiffs' breach of contract or statutory bad faith claims"). For the reasons outlined in detail in connection with the Motion for Summary Judgment, the court

again respectfully rejects State Farm's assertions that testimony regarding costs is irrelevant. Genuinely-disputed material facts concerning both the adequacy and timing of State Farm's payment of ACV remain, and the factual record here does not preclude Plaintiffs from arguing that they are entitled to RCV, notwithstanding their not having affirmatively undertaken to restore their residence. Just as summary judgment on Plaintiffs' claims is not appropriate for those reasons, among others, so also does this record militate against the exclusion of all evidence regarding estimation of costs. Therefore, testimony regarding cost estimation is relevant for purposes of Rule 702.

Turning then to Mr. Cooprider's opinions specifically, State Farm does not meaningfully argue that Mr. Cooprider—who has been qualified as an expert witness at least fifteen times, *see* ECF No. 33 at 4—lacks the requisite "knowledge, skill, experience, training, or education" under Rule 702 to render opinions on cost estimation. *See Roe*, 42 F.4th at 1180. The court therefore finds that Mr. Cooprider is qualified to offer these opinions. *See* ECF No. 33-5 at 4-15 (Cooprider curriculum vitae).

As to whether Mr. Cooprider's proffered opinions are reliable under the second step of the *Roe* analysis, *see* 42 F.4th at 1180-81, State Farm's argument for exclusion seemingly hinges on the existence of a purportedly "undisclosed opinion" contained in Mr. Cooprider's working file, which State Farm conjectures may be Mr. Cooprider's "true opinion." *See* ECF No. 43 at 4; *see also id. passim* (references to the "undisclosed" report and estimates). However, the record is not so impenetrable as State Farm suggests.

On or about July 11, 2022, Mr. Cooprider, along with another Charles Taylor employee named Steve Neyers, prepared an eight-page report entitled "Opinion of Cost of Repair Estimate

and Additional Expenses" for the Spragues' residence. ECF No. 33-7 at 1-8. The report, which is marked "draft," was accompanied by a "Charles Taylor Repair Cost Opinion," along with sketches, photographs, and other supporting documentation. *Id.* at 9-80. The Repair Cost Opinion attached to the draft cover report referenced a total actual cash value repair cost of $632,477.60, and a replacement cost value of $665,195.24, *see id.* at 42—unquestionably lower numbers than in the subsequent reports, including in the report formally disclosed to State Farm pursuant to Rule 26(a)(2)(B) on June 21, 2024. ECF No. 33-5 at 56 (calculating actual cash value of $911,652.02 and replacement cost value of $959,495.74). State Farm argues that, "because the undisclosed estimate appears at least as likely to be [Charles Taylor's] true opinion, nothing else, including extra discovery, could have cured the prejudicial confusion." ECF No. 43 at 4. The logic underlying State Farm's argument collapses on two fundamental levels.

First, there is no substantive evidence indicating that the earlier July 11, 2022 "draft" opinion and attached report[12]—as opposed to the Cost of Repair Report disclosed on June 24, 2024—is Mr. Cooprider's "true" opinion. Experts are not precluded from looking at new information and adjusting their opinions accordingly, and there is nothing in the record indicating that that is not precisely what happened here. Second, the court finds no support for State Farm's statement that "extra discovery" could not have cured any confusion concerning the differences in ACV and RCV amounts that emerged after July 11, 2022. State Farm could have explored those differences by resuming Mr. Cooprider's deposition after his file was produced

---

[12] Plaintiffs apparently do not take the position that Rule 26(b)(4)(B), which specifies that a party need not disclose "drafts of any report or disclosure required under Rule 26(a)(2)," protects this pre-litigation draft from disclosure. Therefore, the court does not consider that question.

and the July 11, 2022 draft came to light, as Plaintiffs' counsel invited State Farm's counsel to

do. State Farm's decision to forego this easily-accessible discovery in favor of attempting to

exclude any evidence of cost estimation from reaching the jury precludes State Farm from

arguing that the Cost of Repair Report is unreliable.

Moreover, to the extent State Farm argues that Mr. Cooprider's opinions are unreliable or

that the methodology underlying them is subject to question because he used Xactimate to

estimate the costs, *see* ECF No. 33 at 15 (asserting that the "[Charles Taylor] Report is facially

insufficient"), the court is not persuaded that Mr. Cooprider's testimony should be excluded on

that basis. Courts routinely have found the Xactimate program reliable for purposes of Rule 702.

*Compass Point Condo. Owners' Ass'n, Inc. v. Landmark Am. Ins. Co.*, No. CV 22-00257-JB-C,

2024 WL 780420, at *5 (S.D. Ala. Feb. 26, 2024) ("The Court is additionally not persuaded that

[the expert's] testimony should be excluded under Rule 702. The estimate disclosed by [the

expert] was prepared using a software application known as Xactimate."); *Kush Enterprises,*

*LLC v. Massachusetts Bay Ins. Co.*, No. 3:18-CV-492, 2021 WL 3007263, at *8 n.4 (E.D. Tenn.

July 15, 2021) ("Because [the expert] . . . used Xactimate, a program commonly used in the

insurance industry, his opinions are sufficiently reliable. Indeed, the Xactimate methodology is

reliable under *Daubert* because inputting the same data into the analysis would reliably result in

the same output.") (quoting *Shadow Lake Mgmt. Co. v. Landmark Am. Ins. Co.*, No. 06-4357,

2008 WL 2510121, at *4 (E.D. La. June 17, 2008)); *Coshap, LLC v. Ark. Corporate Member*

*Ltd.*, No. 1:16-cv-0904-SCJ, 2017 WL 9287017, at *5 (N.D. Ga. Dec. 12, 2017) ("Xactimate is

a common software program used for cost estimation in the insurance industry, and expert

testimony based on the use of Xactimate has been admitted in multiple courts.") (collecting

cases); *Denley v. Hartford Ins. Co.*, No. 07-4015, 2008 WL 2951926, at *4 (E.D. La. July 28, 2008) (internal citation omitted) ("Manale and Wirth's methodology for determining damage was using the Xactimate tool, which Wirth is certified to use. This tool is widely recognized and used in the insurance industry to estimate damage. . . . Using the Xactimate as an estimate tool, this methodology meets the soundness criteria.")). Indeed, in the not-too-distant past, State Farm itself has not "dispute[d] that Xactimate is a reliable valuation tool." *See Norman v. State Farm Fire & Cas. Co.*, No. 13-cv-01643-PAB-CBS, 2014 WL 6477889, at *1 n.2 (D. Colo. Nov. 19, 2014).

This court sees no reason to depart from the reasoning of multiple courts finding that Xactimate is a reliable methodology for purposes of the *Daubert* analysis, and State Farm has presented no justification for doing so. The court therefore concludes that Mr. Cooprider used reliable principles and methods in evaluating the data he received from Plaintiffs and others, and that Plaintiffs have met the threshold necessary for Mr. Cooprider to provide expert testimony in the cost-estimation field.

Finally, in light of these conclusions, the court finds no basis to conclude that this relevant testimony would inappropriately confuse the jury so as to warrant exclusion under Federal Rule of Evidence 403. *See* ECF No. 33 at 14. Rather than silencing Mr. Cooprider altogether, any potential defect or vulnerability in his opinions may be tested by State Farm through vigorous cross-examination, the presentation of contrary evidence, and the production of rebuttal expert opinions.

### ii.      Whether a Rule 26 Violation Occurred

Having found that Rule 702 poses no barrier to the presentation of Mr. Cooprider's

testimony, the court next considers whether Mr. Cooprider's opinions nevertheless should be excluded based on supposed defects in Plaintiffs' disclosures under Rule 26(a)(2)(B). ECF No. 33 at 12-13.

There is no doubt that Plaintiffs made an error in the disclosures for Mr. Cooprider. Counsel for Plaintiffs fumbled the disclosure package by attaching an unrelated "winterization" cover report to Mr. Cooprider's Cost of Repair Report—a mistake counsel has acknowledged and explained. However, the correct Cost of Repair Report *was* produced, and consistent with the analysis in the preceding subsection of this Order, that Report, standing alone, sufficiently delineates the "opinions [Mr. Cooprider] will express and the reasons for them," reflects "the facts or data considered by [Mr. Cooprider] in forming them," and references "exhibits that will be used to . . . support" Mr. Cooprider's opinions. *See* Fed. R. Civ. P. 26(a)(2)(B)(i)-(iii).[13]

Moreover, the substance of the matter is contained in the Cost of Repair Report: the details concerning how Mr. Cooprider ascribes costs to every facet of the restoration of the property, from "General Conditions" (including labor costs), to engineering and architectural fees, materials and supplies, and a room-by-room analysis of restoration costs, ECF No. 33-5 at 21-55, as well as a breakdown of ACV, depreciation, and RCV. *Id.* at 57-58. The Report specifically references documents on which Mr. Cooprider relied, including bids from Sprague Structural Solutions, Hearth House Fireplaces and Grills, Kustom Theater Kreations, and Stoneworks of Colorado. *Id.* at 22, 23, 48. And the Report was appended to a document entitled

---

[13] There is no dispute that Mr. Cooprider's disclosure satisfied the other requirements of Rule 26. He presented his qualifications, a list of cases in which he has testified during the previous four years, and a statement of the compensation he is being paid in the case. Fed. R. Civ. P. 26(a)(2)(B)(iv-vi); ECF No. 33-5 at 13-22.

"Plaintiffs' Disclosure of Expert Testimony Pursuant to F.R.C.P. 26(a)(2)(B)," which states:

> Darwin Cooprider has been retained by Plaintiffs to complete an evaluation of the cost of repairs for the property located at 8045 E. County Rd. 6, Johnstown, Colorado, 80524, which is the subject of this litigation. In addition to a site inspection, Mr. Cooprider reviewed various documents outlined in his report. Mr. Cooprider is endorsed to comment on all documentation that has been obtained through discovery and any and all testimony elicited.

*Id.* at 1.

While Mr. Cooprider might have included some type of separate narrative report to further explain the Xactimate-generated estimates in the Cost of Repair Report, the court observes that other courts have found that an Xactimate report, standing on its own, satisfies the requirements of Rule 26. *See Conner v. USAA General Indemnity Co.*, No. 2:21-CV-03613, at *3 (W.D. La. Feb. 16, 2023) (rejecting argument by insurer that an estimate prepared with Xactimate software was an insufficient expert disclosure under Rule 26 because it did not qualify as a "report" under the Rule and did "not reveal the basis for [the expert's] opinions," and concluding that "USAA had adequate and timely notice of the basis of [the expert's] opinions under Rule 26"); *First United Pentecostal Church v. Church Mut. Ins. Co.*, 119 F.4th 417, 425 (5th Cir. 2024) (affirming district court's denial of a motion in limine to exclude an expert who produced an Xactimate report, accompanied by only "a one-page narrative cover report," where the expert testified that the Xactimate software was "industry standard" for the preparation of estimates); *Carney v. All Am. Homes of Ohio, LLC*, No. 5:07CV79, 2008 WL 8715814, at *3 (N.D. W. Va. Aug. 14, 2008) (recognizing, in holding that a 16-page Xactimate report complied with the requirements of Rule 26, that it "is so detailed that it gives an opposing expert the precise information needed to challenge [the expert's] estimate"; that "[i]t accomplishes

specifically the purpose for adopting the rule; and that the opposing party "has a detailed report for its expert to dispute in whole or in part or even use to evaluate whether settlement is appropriate").

Likewise does the court find that Mr. Cooprider's detailed Xactimate report, consisting of nearly 450 entries, "complies with both letter and spirit of the requirements of Rule 26." *See Carney*, 2008 WL 8715814, at *3. Based on this record, the court cannot find that any violation of Rule 26 occurred. However, even if Rule 26 had been violated, Plaintiffs have met their burden to show that any failure to comply with some aspect of the Rule was harmless under the *Woodworker's Supply* factors. *See Bettmann*, 2024 WL 1829263, at *5.

First, any "prejudicial confusion" associated with the disclosures for Mr. Cooprider, *see* ECF No. 43 at 4, could readily have been cured had counsel for State Farm conducted a short follow-up deposition to which counsel had agreed on September 12, 2024. *Woodworker's Supply*, 170 F.3d at 993 (first two factors for evaluating the harm associated with a Rule 26 violation are prejudice and the ability to cure it). Having declined to take that simple step to clear up any confusion, State Farm cannot credibly be heard to claim unfair prejudice now. Second, nothing about the Cooprider disclosures—including the inadvertent attachment of an incorrect cover report to the correct Cost of Repair Report—realistically portended jeopardy to the trial or its orderly progression. *See id.* (third *Woodworker's* factor is the potential for trial disruption).

Finally, the record is devoid of any indication that Plaintiffs or their counsel acted in bad faith, or willfully, in connection with the disclosure of Mr. Cooprider. Quite the opposite. Mr. Athey took full responsibility for the mistake with the winterization report and for any delay in producing Mr. Cooprider's working file, notwithstanding that State Farm itself had let the latter

issue pass for months without comment. When these omissions were brought to Mr. Athey's attention at Mr. Cooprider's deposition, he immediately took steps to rectify his mistakes and to mitigate any harm to State Farm. State Farm's decision not to continue the deposition of Mr. Cooprider after it reviewed his file negates any speculation that its supposed harm could not have been cured.

Plaintiffs therefore have carried their burden to show that any failure to comply with Rule 26(a)—if there was such a failure, which the court expressly declines to find—caused no harm to State Farm. Fed. R. Civ. P. 37(c)(1). *Bettmann*, 2024 WL 1829263, at *5. Accordingly, this court exercises its discretion to decline to impose a sanction that would preclude Mr. Cooprider's testimony.

The Cost Opinion Motion, insofar as it seeks to exclude Mr. Cooprider's testimony, is **denied**.

### b.    The Forge & Bow Estimate

In seeking to exclude all cost opinion testimony, State Farm also would have the court preclude all reference at trial to the Forge & Bow estimate, which projected that $1,234,301.63 would be required to restore the Spragues' residence. ECF No. 33 at 8, 14, 17 & *passim*; Undisputed Fact ¶ 25.

The argument that the jury should never hear about the Forge & Bow estimate—the highest of the cost estimates for restoring the Spragues' property, again rests on State Farm's assertion that such evidence is irrelevant because "RCB benefits are not owed" to the Spragues and "cannot be owed in the future." ECF No. 33 at 10; *see also* ECF No. 43 at 5 (arguing that "cost estimation opinions," including the Forge & Bow estimate, "are not relevant to any element

of Plaintiffs' breach of contract or statutory bad faith claims") (citing *Taylor*, 2022 WL 1434654, at *2). As emphasized throughout this Order, the court respectfully rejects the contention that Plaintiffs are categorically barred from seeking replacement cost benefits, and thus declines to countenance the wholesale preclusion of testimony concerning the Forge & Bow estimate.

It is the case that Plaintiffs have designated no expert witness to testify about the Forge & Bow estimate. Plaintiffs have affirmatively represented—and they will be held to this representation at trial—that Mr. Cooprider will *not* testify concerning the Forge & Bow estimate. ECF No. 39 at 3 ("Cooprider will testify as to what is contained in his expert report and deposition testimony, *not* what Forge & Bow's estimate opines") (emphasis added); *id.* at 7-8 ("Plaintiffs do *not* intend to elicit testimony [from Cooprider] on direct examination regarding the policy, the amount or timing of payments, the reasonableness of Defendant's conduct throughout the claims adjustment process, *or the estimate prepared by* Hall Ryan, MF Group, or *Forge & Bow*," and averring that Cooprider affirms his 'testimony is only anticipated to be regarding [Charles Taylor's] opinion of cost") (emphasis added). That leaves Jordan Obermann, the owner of Forge & Bow, as the key witness with knowledge of his company's estimate. *See* ECF No. 56 at 15.[14]

Mr. Obermann, however, has been disclosed only as a fact witness pursuant to Federal Rule of Civil Procedure 26(a)(1). ECF No. 33-1 at 2. State Farm asserts that Mr. Obermann, as a

---

[14] In evaluating the Cost Opinion Motion, the court finds it appropriate to consider the parties' arguments in connection with a separate motion in limine in which State Farm also seeks the exclusion of Forge & Bow "estimates and amounts." *See* ECF No. 49 at 13-14 (in motion in limine, arguing that "[t]he Forge & Bow and [Charles Taylor] estimates and amounts should be excluded"); *see also* ECF No. 56 at 15-16 (response to motion in limine); ECF No. 62 at 9-11 (reply in support of motion in limine).

fact witness, cannot testify about the Forge & Bow estimate, which is hearsay. *See* ECF No. 62 at 11 ("Because no expert is disclosed to opine related to any estimate, let alone all the included bids that are separate opinions and hearsay within hearsay procured largely by counsel who is not subject to cross examination, the estimates should be excluded."). Plaintiffs do not dispute that the Forge & Bow estimate is hearsay, but counter that it "is admissible as a business record pursuant to Federal Rule of Evidence 803(6)." ECF No. 56 at 15. That Rule imposes the following requirements on the proponent:

> Records of a Regularly Conducted Activity. A record of an act, event, condition, opinion, or diagnosis if:
> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
> (C) making the record was a regular practice of that activity;
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6). If Plaintiffs can call a qualified witness to testify as to all of these requirements, be that Mr. Obermann or someone else, the court will conclude at trial that the Forge & Bow estimate is admissible hearsay pursuant to the business records exception. However, the proper scope and extent of any testimony beyond the authentication of the Forge & Bowe estimate from Mr. Obermann, or another lay witness who has not been disclosed as an expert and who will not be permitted to provide affirmative or rebuttal expert testimony, is a separate question.

Mr. Obermann, of course, is not prohibited from offering lay opinions pursuant to Federal Rule of Evidence 701, which "allows lay witnesses to offer 'observations [that] are common enough and require a limited amount of expertise, if any.'" *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1214 (10th Cir. 2011) (quoting *United States v. VonWillie*, 59 F.3d 922, 929 (9th Cir. 1995) (cleaned up)). But Rule 701 "does not permit a lay witness to express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness." *Id.* (quoting *Randolph v. Collectramatic, Inc.*, 590 F.2d 844, 846 (10th Cir. 1979)); *see also id.* at 1215 (recognizing that "a person may testify as a lay witness only if his opinions or inferences do not require any specialized knowledge and could be reached by an ordinary person") (quoting *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 929 (10th Cir. 2004)). "[K]nowledge derived from previous professional experience falls squarely within the scope of Rule 702 and thus by definition outside of Rule 701." *Id.* at 1215 (citation omitted). As the Tenth Circuit has emphasized, "a party simply may not use Rule 701 as an end-run around the reliability requirements of Rule 702. Preventing such attempts is the very purpose of subsection (c)." *James River*, 658 F.3d at 1216 (quoting *Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 227-28 (3d Cir. 2008) (cleaned up)).

Here, Mr. Obermann, who created the Forge & Bow estimate, is likely in possession of facts that would not be within the ken of an ordinary lay person and that rest on specialized knowledge he has gleaned from his professional experience in the building industry. That knowledge *might* place certain aspects of his testimony in the category of expert opinion, but the court cannot definitively draw those lines from a position of bare speculation in advance of trial. Rather, the court will analyze and differentiate between Rule 701 lay opinions and Rule 702

expert opinions at trial and will determine at that point whether any testimony from Mr. Obermann transgresses that line. In the meantime, the court defers defining a precise boundary between lay and expert opinions until a foundation has been offered in a particular context and a specific objection is before the court.[15]

Evidence concerning the Forge & Bowe estimate, including possible testimony from Mr. Obermann, will be permitted in accordance with the parameters defined above. The Cost Opinion Motion is accordingly **denied** in its entirety. The court finds no justification for adopting a rule, in advance of trial, that cost-estimation opinions and evidence are subject to exclusion.

### 2.    Collins Motion

Lastly, the court takes up State Farm's argument that the testimony of Stephen Collins, the Spragues' designated claims-handling expert, must be excluded because Mr. Collins lacks the requisite qualifications to render opinions in this arena; his opinions are unhelpful and unreliable; and his opinions devolve to *ipse dixit* statements. ECF No. 35 at 9-15. Upon a careful review of the record, the court finds otherwise, on each of State Farm's challenges. This court cannot conclude that Mr. Collins's opinions fall into that exceptional category warranting exclusion in advance of trial. *See* Fed. R. Evid. 702 advisory committee note to 2000 amendment (recognizing that "the rejection of expert testimony is the exception rather than the rule").

As before, State Farm's argument to exclude Mr. Collins's testimony depends on the court drawing all inferences in *State Farm's* favor by adopting its view of the factual record,

---

[15] The court will consider any appropriate limiting jury instructions concerning Mr. Obermann's testimony the parties may wish to submit.

including, in particular, that "Plaintiffs are seeking replacement cost value of the residence" and nothing more. ECF No. 35 at 10; *see also id.* at 1-4 (repeating State Farm's factual narrative underlying its Motion for Summary Judgment). The court has rejected this argument as both legally insufficient and unsupported by the record, and reiterates that finding here. *See generally supra*; *see also* ECF No. 40 at 3 (statement by Plaintiffs that "Defendant relies on numerous disputed and out-of-context 'facts' to articulate its background section and support its arguments").

### a.    Whether Mr. Collins Has the Requisite Qualifications

Turning to the relevant prongs of the Rule 702 analysis, the court finds no support in the record for State Farm's assertion that Mr. Collins is not qualified to serve as an expert in this case. State Farm attempts to cast Mr. Collins's expertise as stale and insignificant, describing him as a homebuilder in the "early '70s" before he went "back to school." ECF No. 35 at 9. State Farm argues that Mr. Collins brings only "decades-old personal experience" to the table, and his understanding of "how claims are estimated, the availability of service providers, and State Farm's obligations" allegedly rests on nothing more than Mr. Collins's personal "opinion and knowledge." *Id.* at 7. The record belies State Farm's negative characterization of Mr. Collins's extensive professional history and qualifications.

As Mr. Collins's resume shows, he commenced working as an appraiser/claims assistant in 1968, moved on to work as a claims adjuster, and served as a senior claims representative for the Hartford Insurance Company and for United States Fidelity & Guaranty from 1981 to 1988. ECF No. 35-4 at 68-69. He served as a claims manager for a company in Lexington Kentucky from 1988 to 2004. *Id.* at 68. Subsequent to that, Mr. Collins worked in the public sector,

including as an executive advisor and insurance fraud investigator for the Kentucky Department

of Insurance. *Id.* He also served as Chief of Staff for the Speaker's Office in the Kentucky House

of Representatives, where his duties included analyzing "pending legislation related to Insurance

and Environmental law." *Id.* at 1. Mr. Collins summarizes his decades of experience in the

insurance industry, and work related to the insurance industry, in this way:

> I have handled and supervised insurance claims in Comprehensive General
> Liability, Property, Casualty, Automobile and Worker's Compensation insurance
> for more than 25 years. During my career as a claims adjuster and a claim manager
> I have handled or supervised thousands of insurance claims. I am an associate with
> Robert Hughes Associates, Inc., an insurance consulting firm.

*Id.* at 59. The court has no reason to question Mr. Collins's representations, and State Farm has

pointed to no sound basis for rejecting them.

The court is also unpersuaded to find Mr. Collins unqualified based on State Farm's

argument that he lacks specific experience adjusting claims in the state of Colorado. State Farm

primarily relies on *City of Hobbs v. Hartford Fire Ins. Co.*, 162 F.3d 576 (10th Cir. 1998), in

arguing that "state-specific and claim-specific insurance experience" is required for an expert to

offer opinions in the area of insurance bad faith. ECF No. 35 at 13. State Farm overstates the

precedential impact of *Hobbs* on the specific question concerning Mr. Collins's qualifications to

opine about State Farm's handling of the Spragues' claim.

To be sure, in *Hobbs*, the Tenth Circuit found that the trial court did not abuse its

discretion in precluding testimony from an expert who lacked particularized training and

experience in New Mexico insurance regulations. *See* 162 F.3d at 586-87. And that is the critical

point: "[T]he Tenth Circuit's ruling was only that the district court *did not abuse is discretion* by

declining to admit the testimony. This holding does not mean it would have been an abuse of

discretion to admit the same testimony." *King v. Allstate Ins. Co.*, No. 11-cv-00103-WJM-BNB, 2013 WL 3943607, at *6 (D. Colo. July 31, 2013) (emphasis added). This court, like the court in *King*, finds that "*Hobbs* is distinguishable and does not compel a finding that [Mr. Collins's] testimony should be excluded altogether." *See id.* As *King* recognized, "there are numerous cases in which experts have been permitted to testify based on a more generalized notion of expertise." *Id.* at *7 (citing *P.S. ex rel. Nelson v. The Farm, Inc.*, 658 F. Supp. 2d 1281, 1290 (D. Kan. 2009) (expert was qualified to offer opinions based on his experience with foster programs in general and his lack of experience in the particular jurisdiction did not preclude the testimony)).

"[A]s long as an expert stays within the reasonable confines of his subject area, our case law establishes a lack of specialization does not affect the admissibility of the expert opinion, but only its weight." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (quotations and alterations omitted). "Rule 702 does not impose an 'overly rigorous' requirement of expertise, recognizing that specialized knowledge may be acquired through a broad range of experience, skills or training." *Gould v. Union Pac. R.R. Co.*, No. 19-cv-02326-PAB-NRN, 2021 WL 4428286, at *4 (D. Colo. Sept. 27, 2021) (quoting *Squires ex rel. Squires v. Goodwin*, 829 F. Supp. 2d 1041, 1048 (D. Colo. 2011)). A court "should not exclude expert testimony simply because the court feels that the proffered witness is not the most qualified or does not have the specialization considered most appropriate by the court." *Id.* (quoting *Squires*, 829 F. Supp. 3d at 1048).

Therefore, in the instant situation, to the extent Mr. Collins may not have direct training in, or experience with, the insurance industry in Colorado, those facts do not render him unqualified to serve as an expert in this case; instead, they affect only the weight of his opinions

and not their admissibility. There is no evidence before the court showing that Colorado insurance regulations and practices are materially different from those in the states in which Mr. Collins has significant experience, and particularly in those areas in which Mr. Collins seeks to offer opinions, including the circumstances in which an insurer's delay or denial of payment of insurance benefits will be found to lack a reasonable basis or to run afoul of the requirement of good faith and fair dealing. *See* ECF No. 34-5 at 66 (listing Collins's opinions about State Farm's adjustment of the Spragues' claim). State Farm may conduct a rigorous cross-examination of Mr. Collins concerning his supposed lack of "Colorado-specific experience, training, and qualifications and to argue to the jury that the lack thereof means that the jury should afford his opinions less weight than the expert opinions proffered by Defendant," *King*, 2013 WL 3943607, at *7, but this court finds no justification to preemptively preclude Mr. Collins's testimony on this basis.

To sum up, the court finds that Plaintiffs have established that Mr. Collins's experience, training, and qualifications are sufficient to permit him to offer expert testimony in this case.

### b.    Whether Mr. Collins's Opinions Are Reliable

The court begins its analysis of this question by considering Mr. Collins's explanation of his methodology. ECF No. 40 at 10.

Mr. Collins states that he reviewed the fair claims handling procedures established in the National Association of Insurance Carriers Uniform Claims Settlement Practices Act, as adopted in Colorado. ECF No. 34-4 at 60-63 (referencing Colo. Rev. Stat. §§ 10-3-1104, 10-3-1115). He listed the documents he reviewed, *id.* at 72, explaining that "[t]he specific documents listed in the report support the basis for forming my opinions and are examples of correspondence and

conduct to support the opinions. The documents chosen to be included as examples are not exclusively relied upon to form my opinions. All documents, within those reviewed, were considered in forming the stated opinions." *Id.* at 66. Mr. Collins then generated a timeline of events he deemed pertinent to the question he was asked to review: "whether or not State Farm's handling of the Spragues' water damage claim of February 4, 2022 was reasonable and in accordance with insurance industry standard practices." *Id.* at 60, 63-65. Mr. Collins summarized his method in this way: "Based on the above timeline; and based on my review of the documentation listed in Exhibit 'B' and my experience as a claims adjuster with more than 25 years of experience handling and supervising claims in multi-state jurisdictions, I offer my opinions of which I hold to a reasonable degree of certainty . . ." *Id.* at 66.

The court finds that Mr. Collins's explanation—to the extent it is an endorsement of his own methodology—provides "*prima facie* evidence sufficient to satisfy [Plaintiffs'] burden of showing a reliable methodology" by a preponderance of the evidence. *See Pacheco v. State Farm Mut. Auto. Ins. Co.*, No. 23-cv-00305-NYW-SBP, 2024 WL 3834166, at *8 (D. Colo. Aug. 15, 2024) (quoting *Duke Univ. v. Sandoz, Inc.*, No. 18-cv-00997-MSK-KLM, 2021 WL 8153738, at *2 n.1 (D. Colo. Sept. 7, 2021); citing *Squires*, 829 F. Supp. 2d at 1048)). Following that, State Farm was obliged to come forward with competing evidence to refute the *prima facie* evidence presented by Plaintiff. *See Duke Univ.*, 2021 WL 8153738, at *2 n.1 ("[c]ompeting *evidence*— not just argument—will typically be necessary for the movant to refute this evidence") (emphasis in original). State Farm seeks to do this by attacking Mr. Collins's methodology on three grounds: (1) Mr. Collins allegedly has not disclosed any "coherent and applicable opinion"; (2) Mr. Collins allegedly has failed to consider facts that are critical, from State Farm's

perspective; and (3) Mr. Collins's "own conclusions" allegedly "defeat" his opinion that State Farm failed to act in a reasonable and timely manner with respect to the Spragues' claim. ECF No. 35 at 11-14. The court addresses each point, in turn.

The first prong of State Farm's argument—that Mr. Collins expresses no "coherent and applicable opinion"—again rests on State Farm's contention that the Spragues seek only replacement cost benefits in this lawsuit. ECF No. 35 at 15 (asserting that "[t]he most significant methodological flaw is that Collins ignores that Plaintiffs are seeking replacement cost benefits"). For the reasons articulated at length through this Order, the court has rejected the restrictions State Farm would have the court impose as contrary to the record. On this record— which encompasses requests for damages exceeding replacement costs—there is no basis for the court to cast aside as incoherent or inapplicable Mr. Collins's opinions that State Farm engaged in unreasonable delays and violated the requirement of "fair dealing and good faith in adjusting the Spragues['] claim as required by customary industry standards and practices." *See* ECF No. 34-4 at 66.

Neither is some fatal flaw in Mr. Collins's methodology exposed by his alleged failure to consider facts *State Farm* deems critical to the matter. ECF No. 35 at 16-17. State Farm's argument on this point exposes the scope to which its position rests on facts that are subject to genuine dispute, including disputed facts about the timeline of adjusting the Spragues' claim that lie at the heart of the dispute between the parties. *Id.*

State Farm asserts that "[t]here is credible evidence for why State Farm did not [procure an earlier estimate] because nobody else agrees an instant assessment was possible." *Id.* at 17. That may be. But the question is not whether an "*instant* assessment" was possible, but whether

State Farm breached its obligations to the Spragues by engaging in unreasonable delay and denial of coverage under the Policy—including by failing to attempt reconciliation using the Charles Taylor estimate the evidence shows State Farm had in hand two months before it completed the reconciliation of the Hall Ryan estimate. Put simply, there may be "credible evidence" supporting State Farm's view, but there is also countervailing credible evidence in the record. Mr. Collins's methodology is not flawed simply because he has not conceded to the accuracy of State Farm's factual narrative. As one court has put the point:

> [An appraiser expert's] opinion is not rendered inadmissible simply because it is based on Defendants' version of the contested facts. Plaintiff will have ample opportunity to rebut [the expert's] valuation theories during cross-examination. Indeed, Plaintiff will likely also present its competing valuation theories through the testimony of its own expert witnesses, who have based their opinion testimony on Plaintiff's version of the disputed facts.

*United States v. 99,223.7238 Acres of Land, more or less, in Sandoval & Rio Arriba Ctys., New Mexico*, No. CV 06-0933 RB/RHS, 2008 WL 11342918, at *5 (D.N.M. Oct. 6, 2008). Similarly, here, State Farm will have an opportunity to rebut Mr. Collins's theories during cross-examination and to present competing theories through their own experts, who likely will have based their opinion testimony on an interpretation of the facts more favorable to State Farm.

The court next considers State Farm's third assertion that Mr. Collins has made a 'factual admission" that allegedly "defeat[s] any assertion of delay" by State Farm. ECF No. 35 at 17. The alleged factual admission is Mr. Collins's statement that State Farm "finally agreed to an estimate in October of 2022. And when did they have enough information to do that? Probably within – it should have been within four to six months after the loss." *Id.* at 8-9. State Farm would have the court read Mr. Collins's statement as an admission that "State Farm chose 'a

pretty good time' *to start getting an estimate*," *id.* at 12 (emphasis added), and consequently that Mr. Collins's supposed admission constitutes a methodological error of such magnitude as to require exclusion of his testimony. But an equally reasonable construction of Mr. Collins's statement is that four to six months from the date of loss—meaning, sometime between June and August of 2022—would have been "a pretty good time" for State Farm to have *completed* the estimate, not for it "to *start getting an estimate*"—the latter being the words of State Farm's counsel and not Mr. Collins. Notably, Mr. Collins prefaces his "pretty good time" remark with a reference to "October of 2022," the date when State Farm completed the reconciliation of the Hall Ryan estimate and paid out $399,150.52 in ACV to the Spragues. Undisputed Fact ¶ 20.[16]

A three-line excerpt from a deposition exceeding 213 pages in length, *see* ECF No. 35-5 at 84, is an insufficient basis for the court to draw the sweeping conclusion that Mr. Collins has admitted to there being no unreasonable delay on State Farm's part. As Plaintiffs note, other parts of Mr. Collins's deposition can be read to "explain that the estimate should have begun much earlier and could have easily been amended and supplemented as the scope of damage became clearer." ECF No. 40 at 12-13. Deconstructing Mr. Collins's deposition transcript is fodder for cross-examination, not a basis to prevent him from taking the stand. State Farm has offered no evidence, as distinct from mere argument, demonstrating the unreliability of Mr. Collins's methodology.

Neither does the court discern any reason to discount Mr. Collins's opinions as mere *ipse*

---

[16] Counsel for State Farm did not ask Mr. Collins any follow-up questions after the four-to-six-month comment. ECF No. 35-5 at 84:23-25 ("Those are all my questions, subject to reexamination after plaintiffs' questions.").

*dixit*, *see* ECF No. 35 at 18, given that "it is typical for insurance industry experts to rely on their own experience in articulating insurance industry standards." *Pacheco*, 2024 WL 3834166, at *9. The record does not indicate that the opinions rendered by an expert "with more than 25 years of experience handling and supervising claims in multi-state jurisdictions," ECF No. 34-4 at 66, rest on a "because-I-said-so" foundation.

At bottom, State Farm's perception that Mr. Collins's opinions are defective does not render them excludable. "Not every issue raised about an expert's opinion requires the testimony to be excluded," because "many of those concerns can be addressed through vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *United States v. Foust*, 989 F.3d 842, 847 (10th Cir. 2021) (quoting *Daubert*, 509 U.S. at 596) (cleaned up). Those traditional tools for challenging Mr. Collins's opinions are the proper means of attack, and the court anticipates that the trial of this matter will see State Farm utilizing each of these methods.

For these reasons, Plaintiffs have met their burden to show that Mr. Collins's opinions satisfy the requirements of Rule 702 and should not be excluded. The Collins Motion is **denied**.

## CONCLUSION

For the reasons set forth herein, the court respectfully **ORDERS** as follows:

1.      Defendant's Motion for Summary Judgment (ECF No. 34) is **GRANTED, in part**, to the extent that State Farm seeks judgment in its favor on a general breach of contract claim related to Coverage C benefits, and is **DENIED in all other respects**;

2.      Defendant's Motion to Exclude Cost Estimation Opinions Pursuant to F.R.E. 702 and F.R.C.P. 37 (ECF No. 33) is **DENIED**; and

3.    Defendant's Motion to Exclude Opinions of Stephen Collins Pursuant to F.R.E.

702 (ECF No. 35) is **DENIED**.

DATED: June 18, 2025                    BY THE COURT:

_____
Susan Prose
United States Magistrate Judge